**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT H. YOUNG; EDX HOLDINGS,
INCORPORATED,
<u>Plaintiffs-Appellants,</u>

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for Hilton
Head Bank & Trust Company,
N.A.; FIRST PACIFIC CORPORATION;
SWISS-AMERICAN FIDELITY INSURANCE
COMPANY AND GUARANTEE, LIMITED;
ATTILIO FRANCIULLI; JOHN ROCHE;

No. 95-1897

TOM RUHF; GEORGE STRICKLAND;
PRICE WATERHOUSE, Chartered
Accountants, a Bahamian
Partnership; LEE S. PIPER;
HERBERT C. SCHULKEN, JR.; DENNIS J.
GOGINSKY, and other possible
partners of Price Waterhouse LLP,
such as are residents of South
Carolina,
<u>Defendants-Appellees,</u>

and

BRUCE BENN; CORPORATION HOUSE,
LIMITED; RAYMOND JONES; WILLIAM
RUTH; ALFRED MARTIN; GENERAL
BENNETT; TOM WHELAN; CLAUDE
SURFACE; CON FECHER; ED HUGHES,
HELEN CORK; WILLIAM EAXLEY; AN
GROSSHUESCH; CATHY MCGILL, other
possible officers and directors of
Hilton Head Bank and Trust
Company, N.A., after July 1988,
not yet ascertained; HILTON HEAD
BANK & TRUST COMPANY, N.A.;
TONY HABIB,
<u>Defendants.</u>

Appeal from the United States District Court
for the District of South Carolina, at Beaufort.
Falcon B. Hawkins, Senior District Judge.
(CA-89-1398-9-1, CA-92-308-9-1)

Argued: September 25, 1996

Decided: January 10, 1997

Before MURNAGHAN and HAMILTON, Circuit Judges, and
MERHIGE, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Hamilton and Senior Judge Merhige joined.

_____

**COUNSEL**

**ARGUED:** George Hunter McMaster, Columbia, South Carolina, for
Appellants. Jerome Anthony Madden, FEDERAL DEPOSIT INSUR-

2

ANCE CORPORATION, Washington, D.C.; Andrew John Pincus, MAYER, BROWN & PLATT, Washington, D.C.; Thornwell Forrest Sowell, III, SOWELL, TODD, LAFFITTE, BEARD & WATSON, L.L.C., Columbia, South Carolina; Brett Alan Feinstein, Miami Beach, Florida, for Appellees. **ON BRIEF:** Ann S. DuRoss, Assistant General Counsel, Colleen B. Bombardier, Senior Counsel, Maria Beatrice Valdez, Kathy R. Bess, FEDERAL DEPOSIT INSURANCE CORPORATION, Washington, D.C.; C. Allen Gibson, Jr., Catherine Pulley Ballard, Christine E.W. Edenfield, BUIST, MOORE, SMYTHE & MCGEE, P.A., Charleston, South Carolina, for Appellee FDIC. G. Dana Sinkler, Elizabeth T. Thomas, WARREN & SINKLER, L.L.P., Charleston, South Carolina, for Appellees Ruhf and Strickland. J. Calhoun Watson, Suzanne C. Massey, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina; Andrew Plunkett, Office of General Counsel, PRICE WATERHOUSE, L.L.P., New York, New York, for Appellees Price Waterhouse and Partners.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Plaintiff-Appellant Robert Young attempted to raise $600 million to finance gas and oil investments. When the proposed financing failed, Young sued those involved in the financing arrangement. The district court dismissed the claims against some of the Appellees and granted summary judgment to the remaining Appellees. For the reasons stated below, we affirm.

I.

We recount the facts and inferences in the light most favorable to Young. See Donmar Enters., Inc. v. Southern Nat'l Bank of N.C., 64 F.3d 944, 946 (4th Cir. 1995). In 1986, Plaintiff-Appellant Robert Young[1] sought to acquire oil and gas reserves, and he approached

_____

[1] EDX Holdings, Inc. is also a Plaintiff-Appellant in the instant appeal. Young is the President and Chief Executive Officer of EDX Holdings, Inc. For ease of reading, we refer only to Young as the Plaintiff-Appellant throughout the opinion, but such references apply equally to EDX Holdings, Inc.

3

ABN Bank of Canada (ABNB) to finance his venture. ABNB referred Young to Bruce Benn, a financial advisor at Corporation House, Limited (Corporation House). Benn advised Young that he could quickly raise purchase money for the oil and gas reserves through a "credit enhancement" transaction. Benn, for a fee, would arrange for First Pacific Corporation (FPC) to obtain letters of credit from international banks, and Young would then use the letters of credit as collateral to obtain a $600 million loan from ABNB. To provide security for the international banks in case Young defaulted, Young would purchase a surety bond from Swiss-American Fidelity Insurance Company and Guarantee, Limited (SAFIG). John Roche, SAFIG's general manager, would arrange the transaction for a fee. Thus, the letters of credit would secure ABNB's $600 million loan, and the surety bond would secure the international banks' letters of credit. The plan, therefore, allowed Young to shift the primary risk from himself to SAFIG.

To initiate the credit enhancement transaction, Young had to purchase a surety bond from SAFIG. SAFIG's surety bond provided $55 million worth of surety protection for a premium of $2.2 million. SAFIG required an initial deposit of $550,000 from Young to obtain the surety binder. Young did not want to pay cash for the transaction, so Young had his bank, Northpark National Bank (NPNB), issue a letter of credit for $550,000 in SAFIG's favor. On September 16, 1988, after NPNB issued the letter of credit to SAFIG, SAFIG issued a two-month surety binder in FPC's favor, which stated that it would only be effective if Young fully paid the $2.2 million premium.

The $550,000 deposit was supposed to be refundable until Young authorized the issuance of the surety bond. However, on or about September 20, 1988, without Young's consent or approval, SAFIG assigned the $550,000 NPNB letter of credit to FPC. Attilio Franciulli, owner and director of FPC and SAFIG, then unsuccessfully tried to cash the letter of credit at a Miami bank. After that incident, Young told Benn that he wanted nothing further to do with FPC, Franciulli, or Tony Habib, another owner of FPC. Unbeknownst to Young, however, Franciulli and Habib also owned SAFIG. Since Young was unaware of their relationship to SAFIG, he proceeded with the credit enhancement transaction with SAFIG.

For reasons unexplained in the record, SAFIG then refused to accept the NPNB letter of credit and insisted that Young pay the

4

$550,000 deposit in cash. Young borrowed the $550,000 from NPNB. Benn assured Young that his $550,000 loan would be secured by a SAFIG letter of credit, so that if Young defaulted on the loan, NPNB could proceed against SAFIG. Young borrowed the $550,000 from NPNB, and on September 22, 1988, SAFIG issued a letter of credit for $550,000 to NPNB.

According to Young, he agreed to borrow the $550,000 from NPNB only because the SAFIG letter of credit secured the loan. Benn and Young believed that SAFIG's letter of credit provided adequate security because SAFIG had produced an audited financial statement from Price Waterhouse-Bahamas (PW-Bahamas) that stated that SAFIG had $12 million on deposit "with a U.S. bank based in South Carolina." Benn believed that Hilton Head Bank & Trust, N.A. (HHB&T) was the South Carolina bank referred to in the financial statement because Mark Feaster, an HHB&T vice president, allegedly indicated to Benn that SAFIG had $12 million on deposit with HHB&T under a Trust Deposit Agreement. The Trust Deposit Agreement provided that SAFIG would deposit $12 million at HHB&T and that the funds would "not be withdrawn, pledged or otherwise encumbered up to the dollar equivalent of the insurance guarantees confirmed by the Bank." Young contends that Feaster executed the Trust Deposit Agreement, but both Feaster and HHB&T deny it.

PW-Bahamas based the financial statement on a Standard Bank Confirmation, purportedly signed by Feaster, which verified that SAFIG had $12 million on deposit with HHB&T. However, HHB&T's official records do not contain either the Trust Deposit Agreement or the Standard Bank Confirmation. Furthermore, it is undisputed that SAFIG never deposited $12 million at HHB&T.

HHB&T was chosen as escrow agent to facilitate the transfer of the $550,000 between NPNB and SAFIG. Accordingly, NPNB and HHB&T executed an escrow agreement on September 23, 1988. Pursuant to the escrow agreement, NPNB wired Young's $550,000 loan proceeds to HHB&T. On or about September 30, 1988, HHB&T, in accordance with the terms of the escrow agreement, forwarded the $550,000 to Credit Suisse for deposit in SAFIG'S Credit Suisse account. There is no dispute that HHB&T complied with the terms of the escrow agreement.

5

Young, however, contends that SAFIG orally agreed that the loan proceeds would remain on deposit at HHB&T until SAFIG issued the surety bond. The escrow agreement does not contain or reference the oral agreement, nor does any other document memorialize the oral agreement.

Young then defaulted on the NPNB loan. The letter of credit that SAFIG provided to NPNB stated that it was "payable against presentation to [HHB&T] . . . or to Credit Suisse, Bahamas." Young claims that HHB&T also confirmed the SAFIG letter of credit. Young relies on two letters from Feaster, dated January 9 and January 20, 1989, to support his contention. The January 9 letter, on HHB&T letterhead, states: "We hereby acknowledge receipt and confirmation of the attached documentation." However, no documents are attached to the letter. The January 20 letter, also on HHB&T letterhead, confirms the SAFIG letter of credit, but is unsigned. Young contends that the two letters establish that HHB&T agreed to confirm and guarantee the SAFIG letter of credit. HHB&T's official records, however, do not contain the SAFIG letter of credit or the two January 1989 letters.

After Young's default, NPNB presented the SAFIG letter of credit, which secured Young's $550,000 loan, to HHB&T for payment. HHB&T, however, refused to pay.

On June 2, 1989, Young filed suit in the United States District Court for the District of South Carolina against several defendants: 1) HHB&T;**2** 2) SAFIG; 3) John Roche; 4) FPC; 5) Attilio Franciulli; 6) Tony Habib; 7) Corporation House; and 8) Bruce Benn. Young alleged violations of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1961-1968 (West 1984 & Supp. 1996), a RICO conspiracy, 18 U.S.C.A. § 1962(d)(West Supp. 1996), violations of the South Carolina Unfair Trade Practices Act (SCUTPA), S.C. Code Ann. § 39-5-10 to -160 (Law. Co-op. 1985 & Supp. 1995), fraudulent misrepresentation, civil conspiracy, conversion, breach of contract, and wrongful dishonor, S.C. Code Ann. § 36-5-115 (Law. Co-op. 1977).

_____

**2** In August 1991, the Comptroller of the Currency declared HHB&T insolvent and the Federal Deposit Insurance Corporation (FDIC) was appointed as its receiver.

On January 31, 1992, Young filed a second action against several additional defendants: 1) Tom Ruhf, President of HHB&T; 2) George Strickland, Vice-Chairman of the Board, Vice-President, and Trust Officer of HHB&T; 3) various other officers and directors of HHB&T; 4) the FDIC, in its corporate capacity;[3] 5) PW-Bahamas, a partnership with its principal place of business in the Bahamas; and 6) Lee Piper, Herbert Schulken, and Dennis Goginsky, partners of Price Waterhouse-United States (PW-US). Young demanded an accounting and alleged negligence, negligent supervision, and violations of the National Bank Act, 12 U.S.C.A. § 194 (West Supp. 1996). The district court consolidated the two cases for trial with the consent of counsel.

On April 24, 1990, the district court dismissed all claims under the RICO statutes. The court also granted summary judgment to the FDIC on the conversion claim. Young does not appeal those rulings.

On October 16, 1992, the district court dismissed PW-Bahamas for lack of personal jurisdiction and granted summary judgment to the PW-US partners. The court denied Young's Motion to Reconsider on January 7, 1993. On March 31, 1993, the district court dismissed the claims against Habib for lack of personal jurisdiction. Young appeals the dismissal of PW-Bahamas and PW-US, but he does not appeal the dismissal of Habib.

Franciulli filed a motion on May 19, 1993 to compel Young to adhere to the terms of a release agreement that he and Young had entered. The motion also requested the court to compel Young to dismiss Franciulli from the case because of his compliance with the release agreement. At a hearing on August 3, 1993, the district court granted Franciulli's motion to enforce the terms of the release agreement, but the court required Franciulli to continue complying with his obligation under the agreement to cooperate with Young. Young now challenges the validity of the release agreement, and he appeals the district court's ruling enforcing that agreement.

_____

**3** With Young's consent, the district court dismissed the FDIC, in its corporate capacity, on April 28, 1992. The FDIC remains a party, however, by virtue of its receivership of HHB&T.

On September 29, 1993, the district court granted summary judgment to the FDIC on the wrongful dishonor and fraud claims. On February 17, 1994, the district court granted summary judgment to the officers and directors of HHB&T, with the exception of Ruhf and Strickland. On May 3, 1994, the district court granted the FDIC summary judgment on the SCUTPA cause of action. Young appeals the grants of summary judgment to the FDIC, but he does not appeal the grant of summary judgment to the officers and directors of HHB&T. Young settled with Benn and Corporation House in August 1994.

The district court entered a final order on December 9, 1994 that disposed of the remaining defendants and claims. The court granted summary judgment to the FDIC on the fraudulent misrepresentation and civil conspiracy claims. The court also granted Ruhf and Strickland summary judgment on the negligent supervision claim. The court denied Young's Motion to Reconsider on March 7, 1995. Young initially appealed all of those rulings, but he settled with Ruhf and Strickland in September 1996.

II.

A. <u>Claims Against The FDIC</u>

The district court granted summary judgment in favor of the FDIC on all claims. We review those grants of summary judgment <u>de novo</u>. <u>Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.</u>, 43 F.3d 922, 928 (4th Cir. 1995). In order to prevail on a motion for summary judgment, the moving party must establish the absence of genuine issues of material fact and that he or she is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). If the moving party carries its burden, the nonmoving party may not rest on the allegations in his or her pleading, but must produce sufficient evidence that demonstrates that a genuine issue exists for trial. <u>Id.</u> at 324.

1. Wrongful Dishonor, SCUTPA, and Fraud Claims

Young asserts that the two January 1989 letters from Feaster prove that HHB&T agreed to confirm the SAFIG letter of credit. He argues

that HHB&T wrongfully dishonored the SAFIG letter of credit when it failed to pay the letter of credit upon NPNB's presentment. He further contends that by wrongfully dishonoring the letter of credit, HHB&T engaged in an unfair trade practice under SCUTPA. Young also alleges a fraud claim based on HHB&T's transfer of the $550,000 to SAFIG pursuant to the terms of the escrow agreement. The district court granted summary judgment to the FDIC, as receiver for HHB&T, on the ground that the D'Oench doctrine and its partial codification, see 12 U.S.C.A. § 1823(e)(1) (West Supp. 1996), bar all three claims.

The D'Oench doctrine, first described by the United States Supreme Court in D'Oench, Duhme & Co. v. FDIC , 315 U.S. 447 (1942), "prohibits claims based upon agreements which are not properly reflected in the official books or records of a failed bank or thrift." Resolution Trust Corp. v. Allen, 16 F.3d 568, 574 (4th Cir. 1994). The doctrine serves two purposes. First, it allows federal and state examiners to rely on a bank's records in evaluating the institution's fiscal soundness. Id. at 574. Second, it "ensure[s] mature consideration of unusual loan transactions by senior bank officials, and prevent[s] fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Langley v. FDIC, 484 U.S. 86, 92 (1987).

The original test for determining whether claims were barred under the D'Oench doctrine was whether the agreement, oral or written, either was designed to deceive the public authority or would tend to have that effect. D'Oench, Duhme & Co., 315 U.S. at 460. Courts, however, have expanded the doctrine, and it now applies in virtually all cases where the FDIC is confronted with an agreement not documented in the institution's records. OPS Shopping Ctr., Inc. v. FDIC, 992 F.2d 306, 308 (11th Cir. 1993).

Congress substantially codified the elements of the common-law D'Oench doctrine in order to protect taxpayers, depositors, and creditors of failed financial institutions. Allen, 16 F.3d at 574. The statute provides in pertinent part:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . as receiver

9

of any insured depository institution [ ] shall be valid against the [FDIC] unless such agreement (A) is in writing, (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e)(1). A plaintiff must satisfy all four requirements before it can enforce an agreement against the FDIC. Allen, 16 F.3d at 574.

Section 1823(e) essentially encompasses the principles of the common-law D'Oench doctrine. E.J. Sebastian Assocs. v. Resolution Trust Corp., 43 F.3d 106, 108 (4th Cir. 1994). Section 1823(e) does not, however, preempt the D'Oench doctrine. Motorcity of Jacksonville, Ltd. v. Southeast Bank, N.A., 83 F.3d 1317, 1327-34 (11th Cir. 1996). Thus, although the Fourth Circuit and other courts often construe the D'Oench doctrine and section 1823(e) in tandem, see, e.g., E.J. Sebastian Assocs., 42 F.3d at 108, the common-law doctrine and the statute remain separate and independent grounds for decision. Reding v. FDIC, 942 F.2d 1254, 1259 (8th Cir. 1991).

The D'Oench doctrine bars Young's wrongful dishonor claim. Young offers two January 1989 letters, one signed by Feaster and one unsigned, to support his contention that HHB&T agreed to confirm the SAFIG letter of credit. However, an FDIC officer attested that HHB&T's official records contain neither the SAFIG letter of credit nor the two January 1989 letters. Young has not refuted the officer's affidavit. The D'Oench doctrine, therefore, prohibits Young's claim based upon HHB&T's purported agreement because the agreement is not properly reflected in HHB&T's official records.

The same reasoning bars Young's SCUTPA claim. As the district court found, Young bases his entire SCUTPA claim on the wrongful dishonor allegation. Although Young's complaint lists seven acts in

10

addition to wrongfully dishonoring the letter of credit, none could reasonably be considered a trade practice of HHB&T because each relates to the actions of other defendants. The only "trade practice" relating to HHB&T's conduct is the allegedly wrongful dishonor of the letter of credit. As stated above, however, the agreement that formed the basis for that dishonor fails under the D'Oench doctrine because it is not properly reflected in HHB&T's records.

The D'Oench doctrine also bars Young's fraud claim. NPNB and HHB&T executed an escrow agreement that provided that HHB&T would act as the escrow agent to facilitate the transfer of Young's $550,000 loan proceeds between NPNB and SAFIG. Pursuant to that agreement, NPNB wired Young's $550,000 loan proceeds to HHB&T on September 23, 1988. On or about September 30, 1988, HHB&T, in accordance with the terms of the escrow agreement, forwarded the $550,000 to Credit Suisse for deposit in SAFIG'S Credit Suisse account. No one disputes that HHB&T complied with the terms of the escrow agreement. Young, however, alleges that SAFIG orally agreed that the loan proceeds would remain on deposit at HHB&T until SAFIG issued the surety bond. The escrow agreement, which was in the bank's official records, does not contain or reference the oral agreement, however. Nor does any other document in the bank's records memorialize the oral agreement. The D'Oench doctrine, therefore, prevents Young from bringing a claim based on the unrecorded oral agreement.

Young, however, argues that neither the D'Oench doctrine nor section 1823(e) bars his claims. He contends that the D'Oench doctrine does not apply because he falls under the "innocent borrower exception." He contends that section 1823(e) does not apply because his claims address a liability of the bank; they do not diminish or defeat any specific asset of the bank.

Young first argues that the D'Oench doctrine does not apply in the instant case because he falls under the "completely innocent borrower" exception that the Ninth Circuit developed in FDIC v. Meo, 505 F.2d 790 (9th Cir. 1974). The Meo court held that the D'Oench doctrine did not apply because the borrower at issue was "a completely innocent party." Id. at 792.

11

Although the Fourth Circuit has not previously addressed the issue, other circuit courts of appeal that have addressed the so-called "innocent borrower exception" since Meo have rejected it because it conflicts with the underlying rationale of the D'Oench doctrine. See, e.g., Motorcity of Jacksonville, Ltd., 83 F.3d at 1325 (holding that the D'Oench doctrine applies even when the customer is completely innocent of any bad faith, recklessness, or negligence); Dendinger v. First Nat'l Corp., 16 F.3d 99, 102 (5th Cir. 1994) (holding that the Fifth Circuit does not recognize an "innocent borrower" exception to the D'Oench doctrine); In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1338 (1st Cir. 1992) (holding that no "complete innocence" exception to the D'Oench doctrine exists).

We agree with these courts that the Ninth Circuit's complete innocence exception "is based on an outdated understanding of the D'Oench doctrine." FSLIC v. Gordy, 928 F.2d 1558, 1567 n.14 (11th Cir. 1991). Such an exception runs contrary to the doctrine's broad purpose of preventing private parties from enforcing claims against the FDIC based upon agreements not found in the bank's records. The need for bank examiners to rely on a bank's records in evaluating the bank's fiscal soundness remains unaffected by whether or not the customer acted innocently or negligently. Therefore, we hold that the D'Oench doctrine applies even when the customer is completely innocent of any bad faith, recklessness, or negligence.

In regard to section 1823(e), Young points out that the statutory language prohibits claims based on agreements that tend "to diminish or defeat the interest of the [FDIC] in any asset" that the FDIC acquires as receiver of a failed depository institution. 12 U.S.C.A. § 1823(e)(1) (emphasis added). Young claims that since the confirmed letter of credit relates to a liability of the bank, rather than to a specific asset, section 1823(e) does not bar his claim. Several cases in other circuit courts of appeal support Young's contention. See, e.g., E.I. du Pont de Nemours and Co. v. FDIC, 32 F.3d 592 (D.C. Cir. 1994) (holding that section 1823(e) is narrower than the D'Oench doctrine and that section 1823(e) applies only to cases involving a specific asset); John v. Resolution Trust Corp. , 39 F.3d 773, 776 (7th Cir. 1994) ("Section 1823(e) requires an identifiable `asset' which is acquired by the bank and then transferred to the regulatory agency, and to which the unenforceable agreements must relate."); Murphy v.

12

FDIC, 38 F.3d 1490, 1500-01 (9th Cir. 1994) (en banc) (holding that section 1823(e) applies only to assets and does not apply to claims regarding letters of credit because letters of credit are liabilities rather than assets).

However, since we hold that the D'Oench doctrine bars Young's claims, we need not, and do not, address whether section 1823(e) also bars his claims or whether Congress limited section 1823(e) to claims that impair the FDIC's interest in a specific asset. Regardless of any limitation on section 1823(e), several circuit courts of appeals have specifically held that the common-law D'Oench doctrine is not so limited. These courts have held that D'Oench bars claims relating to specific assets and also bars claims relating to liabilities of a bank under FDIC receivership. See, e.g., Inn at Saratoga Assocs. v. FDIC, 60 F.3d 78, 82 (2d Cir. 1995) (rejecting the argument that the D'Oench doctrine is limited by an "asset" requirement because such a requirement "would undercut an important purpose of that doctrine --allowing the FDIC to rely on a bank's records when insuring the bank"); Brookside Assocs. v. Rifkin, 49 F.3d 490, 496 (9th Cir. 1995) (holding that "the common-law [D'Oench] doctrine applies to bar suit even when the RTC does not acquire a specific asset whose value is affected by the alleged secret agreement"); OPS Shopping Ctr., Inc., 992 F.2d at 308-10 (noting that every circuit court of appeals that has expressly addressed the asset limitation argument under the D'Oench doctrine has rejected it); Timberland Design, Inc. v. First Serv. Bank for Sav., 932 F.2d 46, 50 (1st Cir. 1991) (" D'Oench protects the FDIC from [the plaintiff's] affirmative claims which are based upon an alleged oral agreement to lend money in the future."); Bell & Murphy and Assocs. v. Interfirst Bank Gateway, N.A., 894 F.2d 750, 753 (5th Cir. 1990) (rejecting argument that the D'Oench doctrine "bars only claims or defenses based upon unrecorded side agreements that defeat the FDIC's interest in a specific asset acquired from a bank"); Hall v. FDIC, 920 F.2d 334, 339 (6th Cir. 1990) (holding that the D'Oench doctrine protects the FDIC even where the FDIC does not have "an interest in an asset"). Moreover, the Eleventh Circuit specifically has held that the D'Oench doctrine protects the FDIC from claims regarding letters of credit. See OPS Shopping Ctr., Inc., 992 F.2d at 308-10.

We find the reasoning of these courts persuasive. The purposes underlying the D'Oench doctrine do not support a "specific asset"

13

limitation. The Supreme Court designed the D'Oench doctrine to give bank examiners an accurate picture of a bank's financial position. The records of regular banking transactions should reflect all of the rights and liabilities of the bank regarding such regular banking transactions in order for bank examiners to evaluate the bank's fiscal soundness. Therefore, we hold that the common-law D'Oench doctrine bars both claims relating to a specific asset of the bank and claims relating to a liability of the bank.

Thus, we hold that the district court properly granted summary judgment to the FDIC on the wrongful dishonor, SCUTPA, and fraud claims because HHB&T's official records do not contain the agreements that Young relies upon to support his claims, as required by the D'Oench doctrine.[4]

2. Civil Conspiracy and Fraudulent Misrepresentation Claims

Young also brought civil conspiracy and fraudulent misrepresentation claims against HHB&T. Young does not argue, however, and the record does not reflect, that HHB&T's board of directors ordered, authorized, or ratified any act that constituted a civil conspiracy. Nor does Young argue that HHB&T's board ordered or ratified any false representations. Rather, Young argues that HHB&T is liable under the respondeat superior doctrine. Thus, he contends that we should hold HHB&T vicariously liable on the civil conspiracy and fraudulent misrepresentation claims for Feaster's statement on the Standard Bank Confirmation that SAFIG had deposited $12 million dollars at HHB&T when in fact it had not.

The district court granted summary judgment to the FDIC, as receiver for HHB&T, on both claims. In regard to the civil conspiracy claim, the court found that Young failed to allege special damages, an essential element, and also failed to support the other elements of the claim. In regard to the fraudulent misrepresentation claim, the district

_____

[4] Because we hold that the D'Oench doctrine bars Young's wrongful dishonor and SCUTPA claims, we do not reach the district court's alternative holdings that Young failed to establish wrongful dishonor or an unfair trade practice as a matter of law.

14

court found that Young failed to establish that he had a right to rely on Feaster's misrepresentation, an essential element of the claim.

Although the district court granted summary judgment on the ground that Young failed to establish the state-law elements of his claims, we may affirm a grant of summary judgment on different grounds than those relied on below. Lowe v. Sporicidin Int'l, 47 F.3d 124, 131 n.6 (4th Cir. 1995). Regardless of whether Young established the required elements as to Feaster, we affirm the grant of summary judgment to the FDIC, as receiver for HHB&T, on the civil conspiracy and fraudulent misrepresentation claims on the ground that Young failed to provide any evidence that Feaster acted within the scope of his employment.

Civil conspiracy and fraudulent misrepresentation are intentional torts. See Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1012 (D.S.C. 1981) (regarding civil conspiracy); Field v. Mans, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995) (regarding fraudulent misrepresentation). A corporation may be held vicariously liable for such an intentional tort of its officer or agent if the officer or agent acted within the scope of his or her employment. See Crittenden v. Thompson-Walker Co., 341 S.E.2d 385, 387-88 (S.C. Ct. App. 1986). See also 18B Am. Jur. 2d Corporations § 2129 (1985) (collecting cases). Under South Carolina law, an act falls within the scope of employment even if the employee exceeded his or her authority and even if the employee acted contrary to the express orders of the employer. Jamison v. Howard, 247 S.E.2d 450, 451 (S.C. 1978); Crittenden, 341 S.E.2d at 387. Nevertheless, an act falls within the scope of employment only if the employee acted with the purpose of benefiting the employer. Jamison, 247 S.E.2d at 451; Crittenden, 341 S.E.2d at 387-88. If the employee acted for some independent purpose of his own, the conduct falls outside the scope of his employment. Vereen v. Liberty Life Ins. Co., 412 S.E.2d 425, 429 (S.C. Ct. App. 1991); Crittenden, 341 S.E.2d at 287.

In the instant case, no evidence suggests that Feaster acted with the purpose of benefiting HHB&T even incidentally. Indeed, if we accept Young's allegations as true, the evidence suggests instead that Feaster acted to further his conspiracy with Franciulli and Habib and to benefit his own independent purpose of defrauding Young. Young conceded as much at oral argument. Feaster, therefore, did not act within

15

the scope of his employment, and the FDIC, as receiver for HHB&T, cannot be held liable for his conduct.[5]

B. Claims Against Price Waterhouse

1. PW-Bahamas

Young brought a professional negligence claim against PW-Bahamas. He claimed that he relied to his detriment on a PW-Bahamas audit report that erroneously represented that SAFIG had $12 million on deposit "with a U.S. bank based in South Carolina." The district court held, however, that PW-Bahamas has insufficient contacts with South Carolina to support in personam jurisdiction.

We review de novo a district court's dismissal for lack of personal jurisdiction. Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1198 (4th Cir. 1993). However, we review findings of fact pertaining to the dismissal for clear error. Mylan Laboratories, Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993).

Young bears the burden of establishing that personal jurisdiction exists over the nonresident PW-Bahamas. Mylan Laboratories, Inc., 2 F.3d at 60. He must demonstrate two things. First, he must prove that PW-Bahamas's conduct meets the requirements of South Carolina's long-arm statute. Id. Second, he must prove that PW-Bahamas has sufficient contacts with South Carolina to meet the constitutional standards of due process. Id.

South Carolina's long-arm statute extends to the constitutional limits that the due process clause imposes. Triplett v. R.M. Wade & Co., 200 S.E.2d 375, 379 (S.C. 1973). As a result, the state-law analysis collapses into the constitutional analysis. Under that analysis, Young must demonstrate that PW-Bahamas has sufficient "minimum contacts" with South Carolina such that the maintenance of the suit would "`not offend traditional notions of fair play and substantial justice.'"

---

[5] Because we hold that Feaster acted outside the scope of his employment, we do not reach the issue of whether the D'Oench doctrine bars free-standing tort claims not based on an unrecorded agreement and not related to a specific asset of the bank.

16

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).

As the Supreme Court has noted, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). In other words, the defendant must have a "`substantial connection'" with the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957)).

PW-Bahamas is a partnership organized under the laws of the Bahamas, with its principal place of business in Nassau, Bahamas.[6] PW-Bahamas conducted the audit of SAFIG, also a Bahamian company, in the Bahamas, not in South Carolina. PW-Bahamas has no offices, agents, employees, or property located in South Carolina, and it has not engaged in any business in South Carolina. Furthermore, none of its members or employees have ever traveled to South Carolina to conduct business on the partnership's behalf.

---

[6] PW-Bahamas is part of a world-wide organization of separate and independent Price Waterhouse firms that practice accountancy in various countries. The members of each Price Waterhouse firm hold shares in Price Waterhouse World Firm Limited (PW-World Firm), a limited liability company incorporated under the laws of Bermuda. PW-World Firm assists the various Price Waterhouse firms in advancing their respective practices, and it facilitates the maintenance of uniform standards of practice. It does not conduct or supervise client engagements, however. Nor does it play a part in the day-to-day management of the Price Waterhouse firms.

PW-World Firm's bylaws designate twenty-six separate "member firms" in the Price Waterhouse organization. Those member firms include PW-US and Price Waterhouse North Caribbean (PW-North Caribbean), a Cayman Islands partnership authorized to use the Price Waterhouse name pursuant to an agreement with PW-World Firm. PW-North Caribbean sub-licenses PW-Bahamas to use the Price Waterhouse name.

Young bases his personal jurisdiction argument on the Standard Bank Confirmation form that was submitted to HHB&T in South Carolina to confirm SAFIG's deposits there. No evidence suggests that PW-Bahamas itself mailed the form to the bank, but some evidence does suggest that PW-Bahamas used the information contained in the form to substantiate its audit of SAFIG's financial statement. Indeed, PW-Bahamas does not deny that it received information that verified the SAFIG deposit at HHB&T. However, the sole act of using account information from HHB&T in South Carolina does not establish a "substantial connection" between PW-Bahamas and South Carolina; nor does it constitute a purposeful availment of the privilege of conducting business in South Carolina. See Burger King Corp., 471 U.S. at 475 (noting that the "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts" (internal quotation marks omitted)).

The Supreme Court also has held that courts "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." Asahi Metal Indus. Co. v. Super. Ct. of California, 480 U.S. 102, 113 (1987). In particular, the Supreme Court has held that courts should place"significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders" because of the "unique burdens placed upon one who must defend oneself in a foreign legal system." Id. at 114.

In the instant case, the balance of interests weighs against finding personal jurisdiction. PW-Bahamas likely would face a large burden if we required it to defend a claim in South Carolina. It would have to travel between Nassau and South Carolina and participate in a foreign nation's judicial system. South Carolina, the forum state, has little interest in the dispute since Young is a Texas resident and PW-Bahamas prepared the audit report in the Bahamas. Moreover, as a nonresident, Young's interest in obtaining relief in South Carolina is reduced. See Federal Ins. Co. v. Lake Shore, Inc., 886 F.2d 654, 661 (4th Cir. 1989).

Despite these precedents, Young argues that PW-Bahamas could have "foreseen" that investors would rely on its audit letter. However,

18

the Supreme Court clearly has held that "foreseeability" alone is not "a sufficient benchmark for personal jurisdiction under the Due Process Clause." World-Wide Volkswagen Corp, 444 U.S. at 295. Rather, the defendant's conduct and connection with the forum state must be such that he would reasonably anticipate being haled into court there. Id. at 297.

PW-Bahamas could not reasonably anticipate defending an action in South Carolina simply because it made one informational request of a South Carolina bank. Young essentially conceded that point during oral argument. Accordingly, we hold that the district court properly dismissed the claim against PW-Bahamas for lack of personal jurisdiction.

2. PW-US

Lee Piper, Herbert Schulken, and Dennis Goginsky are partners of PW-US, and they reside in South Carolina. PW-US **7** was not involved in the financing, and Young does not allege any wrongdoing by PW-US. Rather, Young contends that we should treat PW-Bahamas and PW-US as a single partnership doing business in South Carolina under the doctrine of "partnership by estoppel," which would make PW-US jointly and severally liable for the alleged wrongdoing of PW-Bahamas.

The district court converted PW-US's motion to dismiss into a motion for summary judgment because the parties presented evidence on the issue outside of the pleadings. The district court then concluded that no partnership existed in fact between PW-Bahamas and PW-US and that the evidence did not support a finding of partnership by estoppel. The district court, therefore, granted summary judgment to PW-US because Young failed to allege that any member of PW-US participated in preparing the audit report.

Under the Uniform Partnership Act, which South Carolina has adopted, a partnership by estoppel arises only where a person, "on the faith of" a representation of partnership by persons who are not actual

_____

**7** We refer to the PW-US partnership and the three PW-US partners interchangeably as PW-US.

19

partners, "give[s] credit to the actual or apparent partnership." S.C. Code Ann. § 33-41-380(1) (Law. Co-op. 1990). Thus, partnership by estoppel arises only where one extends credit to an ostensible partnership in reliance upon a representation of partnership. NCNB Nat'l Bank of N.C. v. Bridgewater Steam Power Co., 740 F. Supp. 1140, 1158 (W.D.N.C. 1990).

On appeal, Young concedes that no partnership existed between PW-US and PW-Bahamas in fact. He also admits that none of the PW-US partners participated in preparing the audit report for SAFIG. He contends, however, that the district court erred in holding that he failed to establish partnership by estoppel. Young argues that PW-US holds itself out as a single partnership with offices around the world. In support of his contention, Young submitted a PW-US brochure that his attorney picked up at a litigation services seminar. The brochure describes Price Waterhouse as one of the "world's largest and most respected professional organizations" with "offices throughout the world." Young asserts that the brochure casts Price Waterhouse as an established international accounting firm and that PW-US promotes that image to gain public confidence in the firm's stability and expertise.

Young does not, however, contend that he relied on the brochure in making his decision to invest. In fact, although Young requested and received ample opportunity for discovery on the issue, he never offered any evidence that he relied on any representation of PW-US. Furthermore, regardless of whether PW-US made any representation upon which Young relied, no evidence suggests that Young gave "credit" to anyone, much less to PW-Bahamas or PW-US. See § 33-41-380(1).

As discussed above, PW-Bahamas does not have a substantial connection with South Carolina. Without such a connection, in personam jurisdiction does not exist over PW-Bahamas unless a basis exists to treat PW-Bahamas and PW-US as a single partnership doing business in South Carolina under the partnership by estoppel doctrine. Since Young failed to establish that he relied on any representation of PW-US or that he gave credit to the alleged partnership, the district court correctly held that a partnership by estoppel did not arise. Therefore, the district court properly dismissed the claims against PW-Bahamas

20

for lack of in personam jurisdiction, and the court properly granted summary judgment to PW-US because Young did not establish any wrongdoing by the PW-US partners.

C. Claims Against Franciulli

Young originally alleged claims of fraud, negligence, conspiracy, and unfair trade practices against Attilio Franciulli. However, given the factual complexity of the case, Young thought it prudent to form an alliance with at least one defendant. He therefore entered into a release agreement with Franciulli on December 13, 1991. The agreement provided that, in exchange for Franciulli's cooperation in Young's suit against the other defendants, Young would release all claims against Franciulli.

On March 31, 1993, the district court entered an order dismissing Tony Habib for lack of personal jurisdiction. In a footnote to that order, the district court noted that it would not rule on Franciulli's earlier motion to dismiss for lack of jurisdiction because of the seemingly valid release agreement. The court noted, however, that Franciulli could reassert the motion to dismiss if Young properly brought a subsequent motion to question the validity of the release agreement. Young did not file any such motion.

Franciulli filed a motion on May 19, 1993 to compel Young to adhere to the terms of the release agreement and to dismiss Franciulli from the case because of his compliance with the agreement. At a hearing on August 3, 1993, the district court granted Franciulli's motion to enforce the terms of the agreement, but the court required Franciulli to continue cooperating with Young. The court ordered Franciulli to appear for a deposition and to turn over several documents that Young's attorney had requested. Pursuant to the district court's order, Franciulli attended a deposition on September 20 and 21, 1993. On November 21, 1994, Young listed Franciulli as a witness for trial. On December 9, 1994, however, the district court entered a final order that disposed of the remaining defendants and claims, thus mooting Franciulli's appearance at the trial.

Young claims that Franciulli failed to cooperate with him and that Franciulli therefore breached the terms of the release agreement. He

21

raised that contention below in the hearing on Franciulli's motion to enforce the release agreement. Young argues on appeal that the district court should have submitted the question of Franciulli's breach to a jury, and he contends that the district court erred in summarily dismissing Franciulli pursuant to the terms of the release agreement. Young concedes, however, that the district court did not enter any orders that actually dismissed Franciulli. He appears to contend instead that the court impliedly dismissed Franciulli when it enforced the terms of the release agreement.

Since we cannot review an order that the district court did not enter, we review only the district court's decision to grant Franciulli's motion to enforce the terms of the release agreement, which impliedly rejected Young's claim that Franciulli breached the agreement. We review the district court's decision for abuse of discretion. See Wilson v. Wilson, 46 F.3d 660, 664 (7th Cir. 1995). **8**

The Fourth Circuit has clearly held that district courts possess the inherent power to enforce settlement agreements and to enter judgments based on such agreements without a plenary hearing. In Petty v. Timken Corp., 849 F.2d 130, 132 (4th Cir. 1988), the plaintiff contended that the district court erred in summarily enforcing a settle-

_____

**8** Young states in his brief that the district court "also erred in releasing SAFIG and FPC on the basis of [the release] agreement." Young correctly points out that the release agreement did not release any individual or entity besides Franciulli, and he therefore contends that the district court erred in releasing SAFIG and FPC pursuant to that agreement.

However, Young did not raise that issue before the district court. Accordingly, Young has waived his right to complain about the district court's treatment. See Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1068 (4th Cir. 1993) (noting that appellate courts ordinarily do not consider issues that the appellant did not raise below).

Moreover, we find no evidence in the record that the district court actually or impliedly released either SAFIG or FPC pursuant to the release agreement. The record reveals instead that the district court entered a default judgment against SAFIG and FPC for failure to comply with discovery orders. We therefore do not address Young's arguments regarding the "erroneous release" of SAFIG and FPC.

22

ment agreement without conducting an evidentiary hearing on the validity of the agreement. The Court held that when there is no doubt as to the existence of a settlement agreement, or the authority of an attorney to enter into a settlement agreement, the district court possesses the inherent authority to enforce the agreement and to enter judgment based on the agreement without a plenary hearing. Id.

In addition, the Fourth Circuit has recognized that trial courts may summarily enforce a settlement agreement in some cases even when one party claims a breach of the terms of the agreement. In Millner v. Norfolk & W.R. Co., 643 F.2d 1005 (4th Cir. 1981), the Court noted:

> This summary procedure has been found to be "admirably suited to situations where, for example, a binding settlement bargain is conceded as shown, and the excuse for nonperformance is comparably unsubstantial."

Id. at 1009 (quoting Autera v. Robinson , 419 F.2d 1197, 1200 (D.C. Cir. 1969)). Finally, the Fourth Circuit has held that district courts also possess the inherent power to supervise and aid the implementation of settlement agreements. See Wood v. Virginia Hauling Co., 528 F.2d 423, 425 (4th Cir. 1975).

In the instant case, the district court did not abuse its discretion in enforcing the terms of the release agreement. As the above precedents demonstrate, the district court possessed the inherent authority to enforce the terms of the agreement since neither party disputed that a settlement agreement existed and neither party claimed that its attorney lacked authority to enter into the agreement. Young's excuse for failing to release Franciulli and his allegations regarding Franciulli's breach are unsubstantial and conclusory; Young failed to cite to the record or to provide any evidence that Franciulli materially breached the terms of the agreement so as to void the release. Furthermore, the district court properly supervised and aided the implementation of the agreement pursuant to its inherent powers when it established the particulars of Franciulli's subsequent deposition.

As the Fourth Circuit held in Petty, 849 F.2d at 133, having second thoughts about the results of a settlement agreement does not justify

23

setting aside an otherwise valid agreement. We therefore hold that the district court did not abuse its discretion in enforcing the terms of the release agreement.**9**

III.

For the foregoing reasons, we affirm the district court's judgment in regard to all issues on appeal.

AFFIRMED

_____

**9** Although we find that Young's appeal lacks merit, we do not find that it is frivolous within the meaning of Federal Rule of Appellate Procedure 38. Accordingly, we deny Franciulli's motion for sanctions, attorneys' fees, and costs pursuant to Rule 38.