**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Warren E. Peterson

    v.                                Civil No. 14-cv-432-LM
                                               Opinion No. 2018 DNH 188

Warden, N.H. State Prison, et al.

O R D E R

Warren Peterson, a prisoner proceeding pro se, brought suit for damages and injunctive relief under the Americans with Disabilities Act to redress a claim of disability discrimination, naming a number of New Hampshire State Prison and New Hampshire Department of Corrections officers and employees as defendants.[1]  Peterson's claim arose out of defendants' alleged failure to accommodate his medical condition that can make it difficult to urinate in the presence of others.

On June 22, 2018, after the jury was selected but before the trial began,[2] the court held a status conference with the parties.  After the status conference, the parties mediated the case before Magistrate Judge Andrea Johnstone and reached a settlement.  The parties memorialized their agreement in writing

---

[1] Peterson also asserted claims of federal constitutional violations against defendants.  Those claims are no longer part of this case.

[2] Trial was scheduled to begin on June 25, 2018.

(the "settlement agreement"), see doc. no. 129-1, and the court dismissed the jury.

Peterson moves to withdraw from the settlement agreement. See doc. no. 127. Defendants object and move to enforce the settlement agreement for the reasons provided in their objection. See doc. no. 129. Peterson objects to defendants' motion.[3] The court resolves both motions in this order.

**DISCUSSION**

"Settlement agreements enjoy great favor with the courts 'as a preferred alternative to costly, time-consuming litigation.'" Fid. & Guar. Ins. Co. v. Star Equip. Corp., 541 F.3d 1, 5 (1st Cir. 2008) (quoting Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 852 (1st Cir. 1987)). Thus, there is a "great reluctance on the part of courts to vacate a carefully negotiated settlement agreement." Ozolinis v. Forest River, Inc., No. 14-CV-30209-MAP, 2016 WL 7217592, at *3 (D. Mass. Dec. 13, 2016).

A party to a settlement agreement may seek to enforce the agreement's terms when the other party refuses to comply.

---

[3] Peterson's objection is labeled a reply to defendants' objection to his motion to withdraw. See doc. no. 130. Because defendants' motion asserts the same grounds as was provided in their objection to Peterson's motion, the court considers Peterson's filing both a reply to defendants' objection and an objection to defendants' motion.

2

*Malave v. Carney Hosp.*, 170 F.3d 217, 220 (1st Cir. 1999).

"Where, as here, the settlement collapses before the original suit is dismissed, the party seeking to enforce the agreement may file a motion with the trial court." *Fid. & Guar. Ins. Co.*, 541 F.3d at 5.

The First Circuit holds that when "the underlying action is brought pursuant to a federal statute, whether there is an enforceable settlement is a question of federal, rather than state, law." *Quint v. A.E. Staley Mfg. Co.*, 246 F.3d 11, 14 (1st Cir. 2001); *see also* *Roman-Oliveras v. Puerto Rico Elec. Power Auth. (PREPA)*, 797 F.3d 83, 86 (1st Cir. 2015). Federal common law "includes the common-sense canons of contract interpretation derived from state law." *Morais v. Cent. Beverage Corp. Union Employees' Supplemental Ret. Plan*, 167 F.3d 709, 712 (1st Cir. 1999) (internal quotation marks and citation omitted); *see also* *In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 569 (B.A.P. 1st Cir. 2017) (noting that federal common law is guided by "general principles of contract law," and whether a valid settlement agreement exists "is ordinarily a function of the parties' intent as expressed in the language of the contract documents"). "These core principles can be derived from the Restatements." *Deville v. U.S. ex rel. Dep't of Veterans Affairs*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) (per curiam);

3

see Markle v. HSBC Mortg. Corp. (USA), 844 F. Supp. 2d 172, 180 (D. Mass. 2011).

Under federal law, a trial court may summarily enforce a settlement agreement, provided that there is no genuinely disputed question of material fact regarding the validity or terms of that agreement.[4]  Bandera v. City of Quincy, 344 F.3d 47, 52 (1st Cir. 2003); see also Malave, 170 F.3d at 220.  The party "who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity."  Del Bosque v. AT & T Advert., L.P., 441 F. App'x 258, 261 (5th Cir. 2011) (citing Callen v. Pa. R.R. Co., 332 U.S. 625, 630 (1948) (internal quotation marks, citation, and alteration omitted)).

Peterson raises two broad arguments in support of his motion to withdraw from the settlement agreement.  He contends that (1) his decision to enter into the settlement agreement "was not intelligent, knowing and voluntary," doc. no. 127 at 1, because he was overwhelmed by defendants' conduct leading up to trial and during settlement negotiations; and (2) the terms of

---

[4] "If there are disputed questions of fact regarding the existence of a settlement agreement, 'the court should hold a hearing and resolve the contested factual issues.'"  In re Manuel Mediavilla, 568 B.R. at 567 (quoting Fid. & Guar. Ins. Co., 541 F.3d at 5).  Because, for purposes of their objection and motion, defendants do not dispute Peterson's factual assertions in his motion or objection, the court resolves the parties' motions without a hearing.

4

the settlement agreement are indefinite and unfair.  Defendants dispute Peterson's arguments in both their objection and their motion to enforce the settlement agreement.

## I.    Whether Peterson's Settlement was Voluntary and Knowing

"Federal law requires . . . that settlement agreements 'be entered into voluntarily and knowingly by the plaintiff.'" Jowers v. Alabama Bd. of Pardons, & Paroles, No. 2:12CV423-MHT, 2013 WL 424726, at *1 (M.D. Ala. Feb. 4, 2013) (quoting Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir. 1981)). "[I]n the absence of a showing of fraud, duress, or other circumstances suggesting that the settlement was not knowing or voluntary, the district court need not examine the circumstances surrounding the settlement."  Newkirk v. Vill. of Steger, 536 F.3d 771, 774 (7th Cir. 2008).

Peterson does not dispute that he willingly attended the mediation and signed the settlement agreement, or that he understood the consequences of settling the case.  Instead, he argues that he did not voluntarily or knowingly enter the settlement agreement because:

> The defendants took advantage of the plaintiff's anxiety disorder and PTSD by flooding him with a tsunami of motions and objections on the eve of trial, demanding phone calls, intimidating him with personal visits by the major, and harassing him repeatedly and throughout the final negotiation process to capitulate.

5

Doc. no. 127 at 2.  Viewed generously to Peterson, his argument is that his settlement was not knowing or voluntary because 1) he was so overwhelmed with anxiety because of defendants' conduct leading up to the trial that he lacked the capacity to validly enter into the settlement agreement, and 2) he was coerced into accepting the settlement by defendants' conduct during the mediation.  The court examines each argument in turn.

A.    Capacity to Enter the Settlement Agreement

Peterson asserts that on June 20 and 21, 2018, in the days leading up to the conference with the court after which he and defendants entered into the settlement agreement, defendant Major Fouts delivered several of defendants' pretrial filings to Peterson, including an updated witness list, copies of exhibits, objections to Peterson's motions, and a memorandum concerning Eleventh Amendment immunity.  He also states that defendants made several attempts to arrange telephone calls with him to discuss settlement in the days leading up to the June 22 hearing.[5]  Peterson contends that these actions made him feel

_____

[5] With regard to defendants' alleged efforts to discuss settlement with Peterson prior to the June 22 hearing, Peterson asserts:

These demands occurred in the final days before the 6/22/18 hearing, one on Tuesday, 6/19/18 when the plaintiff was supposed to be at the law library for

6

intimidated and anxious, and that he was so overwhelmed that he lacked the capacity to enter into the settlement agreement.

"Federal courts that have considered whether a party had the mental capacity to enter into a settlement have relied on the Restatement of Contracts to derive federal common law on the issue." Marston v. United States, No. CIV.A. 10-10437-GAO, 2012 WL 771038, at *6 (D. Mass. Mar. 6, 2012). The Restatement provides in relevant part that "[a] natural person who manifests assent to a transaction has full legal capacity to incur contractual duties thereby, unless he is . . . (c) mentally ill or defective . . . ." Restatement (Second) of Contracts ("Restatement") § 12(2). It further provides, with respect to the effect of mental illness on the capacity to contract, as follows:

---

his scheduled time. The second demand occurred on 6/21/18 at 1PM. Counselor Holmes, who is not my counselor, told me to wait for a phone call "with the court". There was no answer on the first try. When I said I had a prior appointment counselor Holmes threatened me with a disciplinary then he compelled me to write a statement saying why I could not do the call. I do not believe the call was to be with "the court" but rather with the Attorney General's office, and that I was being misled.

Doc. no. 127 at 2.

7

> A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect (a) he is unable to understand in a reasonable manner the nature and consequences of the transaction, or (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.

Id. § 15(1). "A party's capacity is presumed, and, to overcome this presumption, the party carries an extremely heavy burden of demonstrating that he lacked capacity at the time of the disputed transaction." Harrison v. Grobe, 790 F. Supp. 443, 447 (S.D.N.Y. 1992), aff'd, 984 F.2d 594 (2d Cir. 1993) (citations omitted).

Peterson has not shown that he lacked the capacity to enter into the settlement agreement. Although the court does not doubt Peterson's assertion that he felt overwhelmed and anxious because he received a significant number of filings in-person in the days leading up to the June 22 hearing, that anxiety does not mean he lacked the capacity to enter into the settlement agreement. Marston, 2012 WL 4529940, at *22 (noting that the "mental capacity to contract does not require a person to act wisely or discreetly or to drive a good bargain. It only requires that the person be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly." (internal quotation marks and citation omitted)); see generally Lang v. Tewksbury Twp., No.

8

CIV.A. 10-2564 MLC, 2012 WL 503677, at *6 (D.N.J. Feb. 15, 2012) (noting that "stress and anxiety in connection with a lawsuit are common responses to litigation, and for public policy reasons should not constitute a basis for a party to renege on and vacate a settlement agreement"). Nor does Peterson explain how defendants' alleged unsuccessful attempts to arrange telephone calls to discuss settlement with him affected his mental capacity to enter into the settlement agreement.[6] Although Peterson asserts that he suffers from both PTSD and anxiety, "[m]ere evidence of diagnostic labels without content tying them to capacity to give valid consent is inadequate to create an issue as to the consequences of the disorders on an individual's capacity to give valid consent." Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 13 (1st Cir. 1997); see also Morais, 167 F.3d at 714 ("The fact that Morais suffered from various disorders, including depression, and was on medication is insufficient, without more, to invalidate the Agreement."); In re DeLotto, No. BR 15-10648, 2015 WL 6876775,

---

[6] The court notes for the sake of clarity that the court, not defendants, scheduled both telephone calls to discuss recent developments in the case. See June 13, 2018 Notice of Telephonic Hearing; see also June 21, 2018 Notice of Telephonic Hearing. The court arranged both telephone calls as an accommodation to Peterson to give him additional time to consider issues raised in certain of defendants' filings. Peterson refused to attend either telephone call, and both were canceled.

at *11 (Bankr. D.R.I. Nov. 9, 2015) ("Mr. DeLotto bears the burden of establishing that his cognitive impairment [as a result of his multiple sclerosis] was so extreme at the relevant time as to render him legally incompetent to" enter into the agreement.).

Further, Peterson's conduct immediately prior to the mediation demonstrated that he had the mental capacity to enter into the settlement agreement. See Tirado v. Waterbury Hous. Auth., No. 3:14CV01153(JCH), 2015 WL 9943620, at *5 (D. Conn. Dec. 8, 2015) (considering plaintiff's conduct during the settlement hearing as evidence of her mental capacity to enter into the settlement agreement). At the June 22 conference, Peterson expressed to the court that he felt overwhelmed with the volume of defendants' recent filings. The court explained that the number of defendants' filings was not unusual for that stage of the litigation, particularly because several of them were in response to Peterson's filings or concerned scheduling issues for witnesses. Nevertheless, after discussing defendants' recent filings, the court offered to continue the trial for up to one month to allow Peterson to have time to research and respond to any issues raised in those filings if he felt it were necessary. The court also explained that defendants' memorandum on Eleventh Amendment immunity raised a

legal issue that could be resolved after trial, and that if Peterson wished to proceed with trial as scheduled on June 25, the court would allow him time to research and respond to the memorandum after the trial concluded if he obtained a favorable verdict.

Peterson declined the court's offer to continue the trial and stated that he wished to proceed to trial on June 25 and address defendants' Eleventh Amendment immunity memorandum after the trial concluded. Peterson then made clear, compelling, and ultimately successful arguments with regard to certain of defendants' filings, including defendants' objections to the untimeliness of Peterson's exhibits and Peterson's motion to subpoena witnesses. Thus, Peterson's conduct at the June 22 hearing further supports the court's conclusion that Peterson had the mental capacity to enter into the settlement agreement. See Tirado, 2015 WL 9943620, at *5 (holding that plaintiff's behavior at the settlement conference, during which plaintiff presented "her claims in a lucid, calculated and reasoned manner," demonstrated that she did not lack the mental capacity to enter into the settlement agreement).

B. Conduct During the Mediation

"A party coerced into entering a contract has a right to avoid or rescind the transaction." Wright v. Foreign Serv.

11

Grievance Bd., 503 F. Supp. 2d 163, 174 (D.D.C. 2007) (quoting 28 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 71:8 (4th ed. 2000) (internal quotation marks and alteration omitted)).  Peterson contends that he was pressured into accepting the settlement during the mediation.  Specifically, he asserts:

> The plaintiff was further pressured and harassed by the two DOC transportation officers to take the first offer, then the second offer.  At first these officers said that the DOC would never agree to renewing my voiding pass for shy bladder.  Then these officers repeatedly told plaintiff he should take the deal, that he was crazy not to, that he would not do better, that it was the best he could wish for, and that it would set a precedent for the other inmates with shy bladder.  It appears that none of these harassments were true.

Doc. no. 127 at 2.

Assuming that the Department of Corrections officers, who are not defendants in the case or parties to the settlement agreement, encouraged Peterson to take the settlement offer proposed by defendants, Peterson does not explain how that fact warrants vacating the agreement.  Peterson does not state that the officers threatened him and left him with no alternative but settlement.  See Restatement § 175 cmts. a, b (discussing types of threats that may make a contract voidable).  Rather, he asserts that the officers told him that he was getting an excellent deal and advised him to accept the settlement.  To the

12

extent Peterson now believes that the officers' alleged representations that he was getting a good deal were incorrect, that alone does not entitle him to withdraw from the settlement agreement. See United States v. 434 Main St., Tewksbury, Massachusetts, No. CIV.A. 09-11635-JGD, 2011 WL 6337454, at *3 (D. Mass. Dec. 16, 2011) ("'When a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that . . . choice simply because his assessment of the consequences was incorrect.'" (quoting Powell v. Omnicom, BBDO/PHD, 497 F.3d 124, 128 (2d Cir. 2007) (alteration omitted)); see also Restatement § 164(2) (discussing circumstances under which a third party's material misrepresentation could make a contract voidable).

In sum, Peterson's arguments regarding defendants' and the officers' conduct prior to the settlement agreement do not entitle him to relief.

## II.  Terms of the Settlement Agreement

Peterson contends that he should be permitted to withdraw from the settlement agreement because its terms are indefinite and unfair.  Defendants dispute Peterson's characterization of the settlement agreement's terms.

A.    Definitiveness of Terms

Peterson contends that the settlement agreement's terms are "indefinite."  Specifically, he notes:

> 1. The stipulation does not specify what kind of pass will be issued; Will it be a medical restriction pass as is the normal process?
>
> 2. The stipulation does not specify that the pass be listed on CORIS, the DOC database for such records.
>
> 3. The stipulation does not say by when the pass will be issued.  I have not been notified.
>
> 4. The stipulation does not say who will issue/sign the pass.
>
> 5. The stipulation does not say how the pass will be made permanent. DOC policy dictates that when a person who signs a pass leaves or retires the pass becomes invalid. Such happened with legal locker passes when the inmate attorney retired.

Doc. no. 127 at 2-3.

"As a matter of general contract principles, 'an alleged contract cannot be enforced in any form of action if its terms are vague, indefinite and uncertain.'"  Am. Postal Workers Union, AFL-CIO v. Mail Contractors of Am., Inc., No. 1:04-CV-2094-BBM, 2005 WL 8154727, at *3 (N.D. Ga. July 1, 2005) (quoting Am. Viking Contractors, Inc. v. Scribner Equip. Co., 745 F.2d 1365, 1369 (11th Cir. 1984)).  The settlement agreement provides the conditions defendants will follow when Peterson is required to give a urine sample.  Specifically, the settlement

14

agreement states that: 1) Peterson will be allowed up to 36 ounces of water and four hours to produce a urine sample; 2) after being strip-searched and washing his hands he will be taken to the observation cell in the health services center; 3) defendants will provide Peterson with a urine sample cup along with a commode; and 4) if Peterson fails to provide a urine sample with the four hours allotted, a review will be undertaken "pursuant to PPD 5.25 and he may be subject to disciplinary action."  Doc. no. 129-1 at 2.

Peterson does not explain how those terms are vague or indefinite.  Although Peterson's complaints relate to the lack of specifications as to a medical pass, the settlement agreement does not provide that defendants will issue a medical pass. Rather, the agreement binds defendants to abide by the terms therein, and Peterson will have recourse to the extent defendants breach their obligations under the agreement. Therefore, Peterson has not shown that the terms of the settlement agreement are vague or indefinite.

B.    Fairness of Terms

Peterson contends that the terms of the settlement agreement are unfair in two ways.  First, he complains that by settling the case, defendants did not admit wrongdoing, which is

"unjust and unscrupulous."[7]  Doc. no. 127 at 3.  Second, Peterson asserts that the settlement agreement does not address the concerns of other inmates who are suffering from his same condition.

Peterson has not shown a valid basis for withdrawing from the settlement agreement.  Peterson negotiated the terms of the settlement during the mediation.  To the extent he now feels in hindsight that he should have struck a better bargain, that is an insufficient basis to repudiate the terms of the agreement. See Gipson v. Dep't of the Treasury, 549 F. App'x 979, 981 (Fed. Cir. 2013) ("[M]ere postsettlement remorse or change of heart cannot serve as a basis for setting aside a valid settlement agreement.") (internal quotation marks and citation omitted); Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 445 (2d Cir.

---

[7]  Specifically, Peterson states:

> The plaintiff lost nearly $400.00 in personal property in 2014 when the DOC failed to follow his valid medical pass. The defendants admit no negligence therefore the plaintiff may never recover this loss. In addition it cost the plaintiff several hundred dollars in costs (copies, typing ribbons, etc.) to pursue this issue. It is unjust and unscrupulous that the DOC/State should not take responsibility for denying the rights of a legitimately disabled person. This sends a very inimical message from a rehabilitation perspective.

Doc. no. 127 at 3.

2005) ("[I]t is an elementary principle of contract law that a party's subsequent change of heart will not unmake a bargain already made." (internal citation omitted)); Young v. F.D.I.C., 103 F.3d 1180, 1195 (4th Cir. 1997) ("[H]aving second thoughts about the results of a settlement agreement does not justify setting aside an otherwise valid agreement."); Glass v. Rock Island Refining Corp., 788 F.2d 450, 454-55 (7th Cir. 1986) ("A party to a settlement agreement cannot avoid the agreement merely because he subsequently believes the settlement insufficient . . . . [T]hat party remains bound by the terms of the agreement.").

For those reasons, Peterson is not entitled to withdraw from the settlement agreement. His motion is therefore denied and defendants' motion to enforce the settlement agreement is granted.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion to withdraw from the settlement agreement (doc. no. 127) is denied and defendants' motion to enforce the settlement agreement (doc. no. 129) is granted.

The Settlement Agreement provides that "Plaintiff agrees to a voluntary dismissal with prejudice of this matter pursuant to Federal Rule if Civil Procedure 41 . . . ." Doc. no. 129-1 at

17

1.  The Agreement obligated defendants to file the Rule 41 dismissal with the court within 15 days.  See id. at 2. Defendants drafted a stipulation of dismissal and timely mailed it to Peterson, see doc. no. 129-2, who did not sign the stipulation and instead moved to withdraw from the settlement agreement.

The parties shall file a stipulation of dismissal on or before October 17, 2018.  Failure to file a stipulation of dismissal on or before that date will result in dismissal of this case with prejudice.

SO ORDERED

_____
Landya McCafferty
United States District Judge

September 17, 2018

cc:  Lindsey B. Courtney, Esq.
     Warren E. Peterson, pro se
     Scott Edward Sakowski, Esq.

18