**IN RE MANUEL MEDIAVILLA, INC., Debtor.**

PRLP 2011 Holdings LLC,
Appellant/Cross–
Appellee,

v.

Manuel Mediavilla, Inc.,
Appellee/Cross–
Appellant.

**In re Manuel Mediavilla and Maydin G. Meléndez, Debtors.**

PRLP 2011 Holdings LLC,
Appellant/Cross–
Appellee,

v.

Manuel Mediavilla and Maydin G. Meléndez, Appellees/Cross–
Appellants.

BAP NOS. PR 16–053, PR 16–056
Bankruptcy Case No. 13–02800–MCF
BAP NOS. PR 16–054, PR 16–057
Bankruptcy Case No. 13–02802–MCF

United States Bankruptcy Appellate Panel
of the First Circuit.

June 16, 2017

Ubaldo M. Fernández, Esq., and David P. Freedman, Esq., on brief for Appellant/Cross–Appellee.

Carmen D. Conde Torres, Esq., and Luisa S. Valle Castro, Esq., on brief for Appellees/Cross–Appellants.

Before Feeney, Finkle, and Fagone, United States Bankruptcy Appellate Panel Judges.

Per Curiam.

PRLP 2011 Holdings LLP ("PRLP") appeals from the bankruptcy court's order confirming the Second Amended Joint Plan of Reorganization (the "Second

Amended Plan") filed by the individual debtors, Manuel Mediavilla and Maydin G. Meléndez (the "Individual Debtors"), and Manuel Mediavilla's wholly owned corporation, Manuel Mediavilla, Inc. (the "Corporate Debtor" and, together with the Individual Debtors, the "Debtors"), in their jointly administered cases. PRLP also appeals from several prior orders relating to plan confirmation and relating to a settlement agreement between the parties. The Debtors have filed cross-appeals with respect to a prior order relating to their request to designate and disqualify PRLP's votes rejecting the plan pursuant to Bankruptcy Code § 1126.[1]

Although the parties raise a plethora of issues relating to voting and plan confirmation, we conclude that the bankruptcy court erred in confirming the Second Amended Plan because it summarily determined that a certain settlement agreement (the "Settlement Agreement") resolving pending confirmation issues did not exist. The bankruptcy court made erroneous factual findings and committed legal error with respect to the threshold issue of whether there was a valid, binding, and enforceable settlement agreement between the parties and, as a result, the bankruptcy court erred in confirming a plan containing terms materially different from the terms of the Settlement Agreement. As a result, we **VACATE** the confirmation order and **REMAND** to the bankruptcy court for further proceedings consistent with this opinion.

## BACKGROUND

### I. Pre–Bankruptcy Events

We recite the lengthy background of these bankruptcy cases to provide a complete and accurate understanding of the

disputes between the parties, the events that led to settlement negotiations, the confirmation of a plan, and the filing of these appeals.

Both the Corporate Debtor and the Individual Debtors are engaged in the leasing and management of commercial real estate, and they separately own several commercial real properties in Humacao and Guaynabo, Puerto Rico. The Debtors rent the commercial properties to various tenants, and their main source of income is rents received from these tenants. In 2006, the Corporate Debtor obtained a $2,700,000 loan from Banco Popular de Puerto Rico ("BPPR"), as evidenced by a promissory note in that amount ("Note"), which was secured by, among other things, mortgages on most of the Debtors' real properties (including the Individual Debtors' residence), and assignments of rental proceeds from all of the commercial real estate. The Individual Debtors also gave personal guarantees of the Note.

In 2011, BPPR transferred the loan to PRLP, and, when the Note matured in January 2012, the Debtors and PRLP were unable to renegotiate new terms and PRLP called the loan. Unable to collect, PRLP commenced an action against both the Corporate Debtor and the Individual Debtors in the Puerto Rico Court of First Instance, Humacao Section ("Local Court"), and, in March 2013, that court issued orders for the attachment of the Debtors' personal property, including all rental proceeds, and the appointment of a receiver.

### II. The Bankruptcy Case

#### A. Case Commencement

In April 2013, the Individual Debtors and the Corporate Debtor filed separate

---

1. Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, and all references to "Rule" are to the Federal Rules of Civil Procedure.

chapter 11 petitions, thereby staying the case in the Local Court. Thereafter, the bankruptcy court authorized joint administration of the bankruptcy cases. The disputes between the Debtors and PRLP which engendered the action in the Local Court persisted and pervaded the bankruptcy cases from their commencement through these appeals.

In its schedules, the Corporate Debtor listed PRLP as a secured creditor with a disputed and contingent claim in the amount of $2,469,874.01, secured by liens on three commercial properties valued at $2,241,000.00, with an unsecured portion of $228,874.01. It also listed Centro de Recaudación de Ingresos Municipales ("CRIM") as a secured creditor with an unliquidated and disputed tax claim in the amount of $14,654.72. It did not list any creditors holding priority or nonpriority unsecured claims.

The Individual Debtors listed three secured creditors on their Amended Schedule D: (1) PRLP with a disputed and unliquidated claim in the amount of $500,000.00, secured by a lien on real property valued at $400,000.00, with an unsecured portion of $100,000.00; (2) CRIM with an unliquidated and disputed property tax claim in the amount of $1,486.96; and (3) Doral Bank with a claim in the amount of $342,689.30, secured by a lien on the Individual Debtors' Guaynabo residence valued at $650,000.00. The Individual Debtors did not list any creditors holding priority unsecured claims, but they did list unsecured nonpriority claims totaling $3,104,841.00.

At the outset of these bankruptcy cases, PRLP moved the court to prohibit the Debtors' use of cash collateral (namely, the rental income from their commercial properties). After extensive litigation relating to the Debtors' use of cash collateral, including a disputed Emergency Motion to Use Cash Collateral filed by the Debtors, and an Opinion and Order of the bankruptcy court, the parties executed a Stipulation for Use of Cash Collateral, pursuant to which the Debtors agreed to make monthly adequate protection payments to PRLP. In early January 2014, the court approved the stipulation and the Debtors made adequate protection payments to PRLP throughout the course of the bankruptcy cases. Nevertheless, the adversarial relationship between the parties with respect to other issues continued, dominating the entire record of the proceedings in the bankruptcy court.

### B. Proofs of Claim by PRLP and CRIM

PRLP filed separate proofs of claim asserting in each case a secured claim in the amount of $2,635,138.28. It later amended its proofs of claim to include $66,672.78 for pre-petition legal expenses, increasing the total claimed amount to $2,701,810.06 in both cases.[2] It also separated the claimed amount in each case into secured and unsecured portions as follows: (1) in the Corporate Debtor's case, $2,110,000.00 secured and $591,812.06 unsecured claims;[3]

---

2. The amended proofs of claim reflect mathematical errors, as the sum of the original claimed amount and the pre-petition legal expenses is $2,701,811.06 ($2,635,138.28 + $66,672.78), which is $1.00 more than the claimed amount listed in the amended proofs of claim.

3. The amended proof of claim in the Corporate Debtor's case reflects another numerical error as the sum of the secured and unsecured portions listed in the claim is $2,701,812.06 ($2,110,000.00 + $591,812.06), which is $2.00 more than the actual claimed amount of $2,701,810.06, and $1.00 more than what should have been claimed, $2,701,811.06.

and (2) in the Individual Debtors' case, $400,000.00 secured and $2,301,811.06 unsecured.[4] The Debtors objected to PRLP's amended claims.[5]

CRIM filed a proof of claim in the Corporate Debtor's case for unpaid property taxes in the amount of $14,185.65, with a secured portion of $13,539.97 and an unsecured portion of $645.68. In the Individual Debtors' case, CRIM filed a proof of claim asserting a secured claim for unpaid property taxes in the amount of $745.52. PRLP objected to CRIM's claims, alleging, among other things, that the unsecured portion was untimely filed after the bar date for governmental claims.

### C. Original Joint Disclosure Statement and Joint Plan of Reorganization

In November 2013, the Debtors filed in both cases a Joint Disclosure Statement and a Joint Plan of Reorganization ("Original Plan").[6] The Original Plan divided the creditors into the following seven classes:

(1) Class 1—Allowed administrative expenses payable in full on the effective date of the plan or as agreed by the Debtors and the claimants;

(2) Class 2—Allowed secured claim of Doral Bank (in the Individual Debtors' case) payable pursuant to the terms and conditions of the loan;

(3) Class 3—Allowed secured claim of CRIM, payable in full in 36 monthly installments together with interest at the rate of 4.25%;

(4) Class 4—Allowed secured claim of PRLP, payable in full in 60 monthly installments of $12,348.00, with a lump sum at the end of the 60-month term, calculated by amortizing the loan amount over 30 years at 4.25% interest;

(5) Class 5—Allowed unsecured claims of governmental units in Corporate Debtor's case (consisting of Puerto Rico Treasury Department and CRIM), to be paid a dividend of 5% in equal monthly installments over 60 months;

(6) Class 6—Allowed general unsecured claims (consisting of PRLP's deficiency claims), to be paid a 5% dividend in 60 monthly installments; and

(7) Class 7—Equity security holders and/or other interest holders, to receive no payments. The Debtors identified Classes 3, 4, 5 and 6 in the Original Plan as impaired classes of claims.

PRLP objected to the Joint Disclosure Statement, arguing, among other things, that: (1) it did not provide "adequate information" because it failed to independently classify and treat PRLP's secured and unsecured claims in each case; (2) it did not provide a sufficient basis to assess the feasibility of the Original Plan; and (3)

---

4. The amended proof of claim in the Individual Debtors' case also reflects an additional numerical error. Although the sum of the secured and unsecured portions listed in the claim is $2,701,811.06 ($400,000.00 + $2,301,811.06), which is the amount that should have been claimed, it differs from the $2,701,810.06 actually claimed.

5. The Debtors raised two objections: (1) PRLP was time-barred from adding the attorneys' fees, costs, and expenses to its claims; and (2) PRLP's claims needed to be adjusted

to reflect post-petition adequate protection payments received from the Debtors.

6. The Debtors stated that they jointly filed the disclosure statement and plan as their primary secured debt to PRLP arose from one loan to the Corporate Debtor, which was guaranteed by the Individual Debtors in their personal capacities and secured by mortgages on both the Corporate Debtor's and the Individual Debtors' real estate, and payments to PRLP would come from a "mutual fund."

the Original Plan was unconfirmable on its face for numerous reasons.

After a hearing on January 29, 2014, the bankruptcy court directed the Debtors to supplement their Joint Disclosure Statement to "independently classify and treat all secured and unsecured claims for the corporate and individual cases." Thereafter, the bankruptcy court approved the Joint Disclosure Statement, as amended by the supplement, directed the Debtors to solicit votes pursuant to § 1125, and scheduled a confirmation hearing for April 22, 2014. PRLP moved for reconsideration of the order approving the Joint Disclosure Statement, arguing among other things, that the Debtors did not provide all of the information ordered by the court, specifically information relating to the classification of claims and the calculation of the proposed 4.25% cramdown interest rate for PRLP's claims. The parties then filed a series of responses and replies.

On March 19, 2014, PRLP filed motions to convert the Debtors' cases to chapter 7 ("PRLP's Motions to Convert"), arguing that § 1112(b) "mandated" conversion and that conversion was in the best interest of creditors and the estates. The Debtors opposed conversion.

On April 8, 2014, PRLP filed an objection to confirmation of the Original Plan asserting numerous grounds, including the following: (1) CRIM's claims were unimpaired and not entitled to vote; (2) classification of two unsecured classes was improper "gerrymandering" designed to obtain the acceptance of an impaired class; (3) the Original Plan failed to separately classify and treat PRLP's secured and unsecured claims for each of the cases, instead treating the claims as if the two cases were substantively consolidated; (4) the Original Plan did not comply with § 1129(b)(2)(A) as it failed to provide an adequate cramdown interest rate for

PRLP's claims; (5) the Original Plan violated the absolute priority rule; (6) the Individual Debtors had not shown they were pledging all disposable income to pay unsecured creditors as required by § 1129(a)(15); and (7) the Debtors failed to demonstrate the feasibility of the Original Plan, in particular, the ability to make payments to PRLP.

**D. First Amended Plan**

In April 2014, the Debtors filed an Amended Joint Plan of Reorganization ("First Amended Plan"). The Debtors again classified claims in seven classes, but divided CRIM's Class 3 claims, PRLP's Class 4 claims, and the General Unsecured Creditors' Class 6 claims into sub-classes in order to segregate the Corporate Debtor's and the Individual Debtors' creditors into separate voting sub-classes (Class 3A, 4A, and 6A for the Corporate Debtor's case and Class 3B, 4B, and 6B for the Individual Debtors' case). The Debtors also increased the amount and the rate of interest to be paid to PRLP, indicating that payments would be made from net proceeds of their rental income plus a substantial lump sum payment at the end of the plan term, and provided that priority and general unsecured creditors would be paid from the sale proceeds of one of the Corporate Debtor's real properties. PRLP renewed its objections to confirmation.

On April 22, 2014, the bankruptcy court held a combined hearing on confirmation of the First Amended Plan, PRLP's Motions to Convert, and PRLP's motion for reconsideration of the order approving the Joint Disclosure Statement. The court ruled that, due to certain unresolved issues arising from multiple filings the day before, it could not hold the hearing on plan confirmation or PRLP's Motions to Convert. However, it granted the motion for reconsideration in part, directing the Debt-

ors to file an amended supplement to the Joint Disclosure Statement to provide "a brief explanation of how they calculated the interest rate of 5.15% at which Debtors [we]re proposing to restructure PRLP[']s claim." The court also directed the parties to submit additional briefing regarding the classification of CRIM's tax claims and ordered the Debtors to supplement and recirculate the Joint Disclosure Statement and First Amended Plan and re-solicit votes. The hearing was continued to June 2, 2014.

On May 1, 2014, the Debtors filed a second supplement to the Joint Disclosure Statement, in which they explained their application of the so-called "formula approach" set forth in Till v. SCS Credit Corp., 541 U.S. 465, 479–85, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), to calculate the 5.15% interest rate for PRLP's claims in the First Amended Plan. PRLP objected, challenging the Debtors' application of the Till formula approach to determine the appropriate interest rate and arguing that the Debtors had failed to consider relevant risk factors which required a substantial increase of the interest rate.

On May 19, 2014, the Debtors filed a Motion Submitting Ballots, in which they submitted all newly solicited ballots, including CRIM's accepting ballots under Classes 3A, 3B, and 5, and PRLP's rejecting ballots under Classes 4A, 4B, 6A, and 6B. They also filed a motion referencing the requirements for confirmation under § 1129 in which they contended that the First Amended Plan met all requirements for confirmation.

### E. Motion to Designate and Disqualify PRLP's Votes Pursuant to § 1126(c) and (e)

On May 19, 2014, PRLP filed a motion informing the court that PRLP's counsel

had paid CRIM's unsecured claim, allegedly eliminating CRIM's accepting vote. As a result of this action, the Debtors filed a motion asking the bankruptcy court to designate PRLP's votes rejecting the plan as having been made in bad faith under § 1126(e) and to disqualify PRLP's rejecting votes under § 1126(c) ("Designation Motion"). According to the Debtors, PRLP made the payment to CRIM on the eve of the confirmation hearing solely to eliminate CRIM's accepting vote under Class 5 and impede confirmation. PRLP opposed the Designation Motion, arguing that the Debtors had mischaracterized its motives in paying off CRIM's unsecured claim and that it was lawfully exercising its rights under the loan agreement and as a creditor in the bankruptcy cases.

After an evidentiary hearing in July 2014, the bankruptcy court entered an order granting the Designation Motion ("Designation Order"), thereby invalidating PRLP's votes. PRLP moved for reconsideration pursuant to Bankruptcy Rule 9023, and the Debtors objected. On September 23, 2014, the bankruptcy court entered an order granting reconsideration and reinstating PRLP's votes in both cases (the "Reinstatement Order"). The Debtors moved the court to make additional findings of fact under Bankruptcy Rule 7052(b), and PRLP opposed that request. Although the bankruptcy court entered an order granting the Debtors' request for additional findings of fact and clarifications under Bankruptcy Rule 7052(b), it held that the amended findings did not alter its ultimate conclusion that PRLP's votes should not be designated. Thus, the court held that the Reinstatement Order "will stand as our final order, as amended by the additional findings of fact which we incorporate therein." [7]

---

7. Although the Debtors previously appealed the Reinstatement Order in both cases, the

### F. Confirmation Hearing

Commencing on February 24, 2015, the bankruptcy court held a five-day combined hearing on confirmation of the First Amended Plan and PRLP's Motions to Convert. On the first day of the hearing, the bankruptcy court sustained in part and overruled in part PRLP's objection to CRIM's claims, effectively disallowing the unsecured portion of CRIM's claim in the Corporate Debtor's case (which was included in Class 5) as untimely filed, but allowing the secured portion of the claims included in Classes 3A and 3B of the First Amended Plan. At the conclusion of the hearing, the court took the other matters under advisement.

### G. Post–Confirmation Hearing Orders

On June 16, 2015, the bankruptcy court entered an Opinion and Order ("June 16, 2015 Order") denying confirmation of the First Amended Plan and denying PRLP's Motions to Convert. In re Manuel Mediavilla, Inc., No. 13-2800 (MCF), 2015 WL 3780463 (Bankr. D.P.R. June 16, 2015). In denying confirmation, the court concluded that, as the cases were not substantively consolidated, the Debtors could not consolidate treatment of PRLP's claims without consolidating all creditors' claims in both cases. The court stated:

> The Court allowed Debtors to file a Joint Disclosure Statement and Plan since the cases were administratively consolidated. However, the Court also warned Debtors that all claims would have to be independently classified and treated for each case. PRLP filed two different proofs of claim related to two independent bankruptcy debtors; the fact that the cases were administratively consolidated does not change this fact.

Panel dismissed the appeals as interlocutory.

. . . .

> Debtors' actions to pool their collaterals [sic] together for the purpose of only recognizing one secured claim that will be paid in full is equivalent to a substantive consolidation, which has not been requested or approved in these cases. Debtors provide no legal basis for the substantive consolidation of one creditor's claims without consolidating all creditors' claims in both cases. Since the administratively consolidated cases have independent estates, each case should be analyzed separately and should propose its own classification of claims. Since both the [C]orporate [D]ebtor and the [I]ndividual [D]ebtors independently respond for the totality of PRLP's loan and their specific collateral[ ] [is] not worth more individually than PRLP's claims, they both have a deficiency that they need to provide for independently in the Joint Plan. As a result, PRLP has a secured claim up to the value of its collateral in the corporate case for $2,100,000 and in the individuals' case for $400,000, respect[ively]. The difference between the value of the collateral[ ] in each case and PRLP's proofs of claim in each case, as reduced by adequate protection payments, will therefore be the unsecured deficiency portions of its claims and proper treatment should be provided for them under the Joint Plan.

> Since Debtors have not requested the substantive consolidation that might allow for the treatment of PRLP's claims as fully secured by both estates, the Joint Plan as proposed cannot be confirmed at this juncture. The Court will not address the remaining objections to confirmation raised by PRLP since Debtors would need to amend their plan to properly classify and treat PRLP's claims separately which could possibly

affect the interest rate proposed for the secured claims, the disposable income available in the individuals' case, the feasibility of the plan or whether the plan violates the absolute priority rule.

Id. at *8–9 (footnote omitted).

As a result, the court ordered the Debtors to further amend the First Amended Plan to provide, in the absence of substantive consolidation of the cases, separate classification and treatment of PRLP's secured and unsecured claims in each case. The court also overruled several of PRLP's objections to confirmation, including its objections regarding the classification and impairment of CRIM's tax claims (upon which it had already ruled at the confirmation hearing), and its objection based on alleged "gerrymandering."

A few days later, on June 19, 2015, the bankruptcy court entered an Opinion and Order (the "June 19, 2015 Order") in which it overruled the Debtors' objections to PRLP's claims and allowed the amended claims. In re Manuel Mediavilla, Inc., No. 13-2800 (MCF), 2015 WL 3827708 (Bankr. D.P.R. June 19, 2015).

Both PRLP and the Debtors moved for reconsideration of the June 16, 2015 Order. The Debtors sought reconsideration of the denial of confirmation based on the treatment of PRLP's claims. In the alternative, the Debtors requested nunc pro tunc substantive consolidation. The Debtors did not seek reconsideration of the June 19, 2015 Order overruling their objections to PRLP's claims and allowing the amended claims. PRLP sought reconsideration of the court's ruling regarding the classification and impairment of CRIM's secured claims.

## H. December 30, 2015 Decision

On December 30, 2015, the bankruptcy court issued an Opinion and Order ("December 30, 2015 Decision") resolving both of the pending motions for reconsideration and other confirmation issues relating to the appropriate cramdown interest rate for PRLP's claim, the disposable income test, and compliance with the absolute priority rule. In re Manuel Mediavilla, Inc., No. 13-2800 (MCF), 2015 WL 9590312 (Bankr. D.P.R. Dec. 30, 2015). We recount each part of the December 30, 2015 Decision in turn.

### 1. PRLP's Motion for Reconsideration

First, the court denied PRLP's motion for reconsideration regarding the impairment of CRIM's secured claims and held, consistent with In re Tree of Life Church, 522 B.R. 849, 861 (Bankr. D.S.C. 2015), that secured tax claims could be separately classified and could be impaired for purposes of voting. In re Manuel Mediavilla, Inc., 2015 WL 9590312, at *3. The court also found that CRIM's claims were impaired since the First Amended Plan provided for payment of only 3.5% interest, although under § 511 CRIM was entitled to 10% interest as determined by applicable nonbankruptcy law. Id. at *4. Thus, the court ruled, the First Amended Plan's treatment of CRIM's secured tax claim altered CRIM's right to collect 10% interest on unpaid pre-petition property taxes and, as a result, CRIM's claims were impaired and CRIM was entitled to vote on the plan. Id.

### 2. The Debtors' Motion for Reconsideration

On reconsideration, the court ruled that PRLP's claims could be treated as a single secured claim with payment coming from the combined rental income of the Debtors.[8] Id. at *8. The ruling was based on the reduction of PRLP's total claim against the Debtors (through post-petition payments) to an amount less than the value of

---

8. In making this ruling, the bankruptcy court did not acknowledge the June 19, 2015 Order

the collateral securing the claim, for which the Debtors were jointly liable. Id. The court explained: "Consistent with Debtors' treatment of PRLP's claim as a single secured claim in the Joint Plan and the fact that both Debtors hold only one loan for which they are jointly and severally liable, it follows that the entire amount of the claim is over-secured because the aggregate amount of the collateral is more than the claim." Id. at *6. The court was also concerned that treating PRLP's claim as separate claims against the Corporate Debtor and the Individual Debtors would now result in "duplicate payment" to which PRLP was not entitled under Puerto Rico law. Id. at *6–7. Noting that under Puerto Rico law, the payment obligation from joint and several debtors is "exigible from each debtor," the court ruled that PRLP was entitled to collect its claim in full "from any and all" of the Debtors, but it was not entitled to duplicate payment under Puerto Rico law "by asserting and realizing from both [bankruptcy] estates through plan distribution[s] . . . ." Id.

The court further ruled, however, that as a result of the treatment of PRLP's claim as over-secured, PRLP was entitled to post-petition, pre-confirmation interest and post-confirmation interest on the secured claim pursuant to § 506(b). Id. at *7. As a result, the bankruptcy court ordered the Debtors to further amend their First Amended Plan to provide for payment of post-petition interest on PRLP's single, fully secured claim. Id.

3. **PRLP's objections to confirmation based on the cramdown interest rate, compliance with the disposable income test, and violation of the absolute priority rule.**

Having addressed the parties' motions for reconsideration, the bankruptcy court overruling the Debtors' objections to PRLP's claims and allowing the amended claims in

also overruled PRLP's remaining objections to confirmation based on the cramdown interest rate proposed by the Debtors, compliance with the disposable income test, and violation of the absolute priority rule. Id. at *7–9. The court determined that the Debtors' proposed cramdown interest rate of 5.15% was appropriate under Till's formula approach. Id. at *9. It also determined that PRLP did not have standing to assert objections based on the disposable income test or the absolute priority rule as it was no longer an unsecured creditor. Id.

### I. The Settlement Agreement, the Motion to Inform, and the Motion to Vacate

One day after the bankruptcy court issued the December 30, 2015 Order, on December 31, 2015, PRLP filed a "Motion to Inform Settlement" ("Motion to Inform") in which it stated in pertinent part:

1. Following months of extended negotiations, PRLP on one hand, and on the other hand the Debtors (Manuel Mediavilla, Inc., and Manuel Mediavilla and his wife Maydin Melendez) reached a settlement of all their controversies, memorialized in a "Settlement Agreement" *fully executed and delivered prior to noon AST December 30, 2015.* True copies of said Settlement Agreement and its Exhibits are attached hereto as **Exhibit A.**

2. By agreement of the parties, the Debtors have the duty to file timely and notify the Settlement Agreement and its complementary "Transfer Motion" and [a] "Second Amended Plan."

both cases.

3. PRLP anticipates that further motions concerning this subject will be filed in due course.

(emphasis added). PRLP attached a copy of the Settlement Agreement to the Motion to Inform which revealed that the Debtors executed the Settlement Agreement on December 28, 2015, and PRLP executed it on December 30, 2015.

The Settlement Agreement was comprehensive, containing five recitals, including one in which the parties stated that they had "conducted extensive litigation," and recognized the bankruptcy court's June 16, 2015 Order and the pending motions for reconsideration of that order. The Settlement Agreement contained 31 separate paragraphs that provided for the transfer of one of the Corporate Debtor's commercial properties to PRLP in full satisfaction of PRLP's claim for $1,600,000.00, and the release of its liens against all other properties owned by the Debtors.[9] Pursuant to the Settlement Agreement, the parties contemplated the simultaneous filing of a "Transfer Motion," a "Stipulation," and an amended plan of reorganization to incorporate the settlement terms ("Plan Incorporating Settlement"). In addition, the parties agreed that PRLP would hold an unsecured claim net of the Transfer Payment in the amount of $566,842.48 against the Corporate Debtor and a claim in the same amount as to the Individual Debtors "for voting purposes only." PRLP agreed, however, that it would receive no distributions for its unsecured claims and would "cast a favorable vote as an unsecured claimant under each of the corresponding classes, on the date that Debtors file[d]

their" [Plan Incorporating Settlement] with the Court . . . ."

Specifically, the Settlement Agreement provided at paragraph 7: "Debtors and PRLP, or its designee, shall file a stipulation describing this Agreement and jointly requesting the Court's approval thereof (the "Stipulation"). The Stipulation shall request a shortened objection period of seven (7) days." It further provided at paragraph 8:

Simultaneously with the filing of the Stipulation, Debtors shall file a motion for the transfer to PRLP, or its designee, of Property A pursuant to Sections 363 and 1146 of the Bankruptcy Code, free and clear of liens, claims, interests and encumbrance[s] and the assignment of leases . . . (the "Transfer Motion"). The Transfer Motion shall request a shortened objection period of seven (7) days, shall be consistent with the terms of this Agreement, and shall be reviewed and approved by PRLP before filing.

Pursuant to paragraph 9, the Debtors were to file their Plan Incorporating Settlement simultaneously with the Transfer Motion and the Stipulation.

Other relevant provisions of the Settlement Agreement include paragraph 11, which provided:

In the event that the Debtors fail to comply with any of the terms of the Stipulation, this Agreement or the confirmed Plan, the claims of PRLP or its designee will be restored to their original pre-petition state and PRLP or its designee shall be entitled to collect the full amount of its Allowed Claims

---

9. As part of the Settlement Agreement and the transfer of one of the Corporate Debtor's properties to PRLP, denominated the "Transfer Payment," the Corporate Debtor was required to execute documents necessary to grant PRLP a perpetual easement to provide an access road for a parking lot. The Debtors

agreed to pay $20,000.00 per month until the Transfer Payment was completed. PRLP agreed to bear all costs associated with the "segregations and aggregations" of the properties, the notarization of documents, and the release of the liens encumbering the Debtors' other properties.

against the Debtors and foreclose on its collateral. If the failure is incurred by PRLP, then the Debtors' rights and claims or its designee will be restored to their original pre-petition state.

Paragraph 13 provided: "The execution of this Agreement by the Debtor and its performance of its obligations hereunder, are subject to the approval [of] the Bankruptcy Court. This Agreement is conditioned on the Court approving the Stipulation, the Transfer Motion and the [Plan Incorporating Settlement]."

Paragraph 20.1 provided:

Time is of the essence of each provision of this Agreement. The parties agree to request the Bankruptcy Court to approve the Stipulation, the Transfer Motion, the Settlement Agreement, and confirmation of the [Plan Incorporating Settlement], upon notice to creditors and parties in interest reduced to seven (7) days under the provisions of Fed. [R. Bankr.] P. 9006.

Paragraph 21 provided: "This Agreement constitutes *the entire and final* agreement between the parties and there are no agreements, understandings, warranties or representations between the parties except as set forth herein .…" (emphasis supplied). Finally, paragraph 28 provided: "This Agreement will be interpreted and construed under the internal laws of the Commonwealth of Puerto Rico and the Bankruptcy Code."

Notwithstanding their execution of the Settlement Agreement, on January 4, 2016, the Debtors filed an "Urgent Motion Submitting Debtor[s'] Opposition to PRLP's Unauthorized Motion to Inform Settlement, Debtor[s'] Request to Strike Motion and Possible Action under FRBP 9011" ("Debtors' Urgent Motion") contending that PRLP's assertions regarding the settlement were "incorrect" and "unautho-

rized," and that there was no binding Settlement Agreement. The Debtors stated:

3. Even though negotiations were in place[ ] and the initial document was signed, the [ ] entire negotiations were subject to final essential complimentary documents to the agreement, including: Transfer Motion; Amended Plan of Reorganization and new ballots by PRLP accepting Debtor[s'] Plan of Reorganization *which PRLP never submitted and kept delaying the negotiations.* It was not [until] after the Opinion and Order was entered that PRLP, in a desperate attempt to compromise the Debtors, started sending documents to complete the negotiations (the ballots were never submitted). After the Opinion and Order was entered and prior to PRLP's filing of the informative motion *we had pre[viously] advised PRLP's counsel that the transaction had to be stayed and reviewed* under the new circumstances of the Opinion and Order.

4. Counsel for PRLP was specifically advised that the Debtors were not submitting any settlement to the Court until counsels [sic] had the opportunity to review the transaction under the provisions of the Opinion and Order and discuss the same with the Debtors. Therefore, PRLP's Motion to Inform Settlement was filed without authorization from the Debtor or Debtor[s'] counsel, unilaterally and after PRLP's attorney was expressly admonished not to file.

5. The Debtors have requested that PRLP voluntarily withdraw[ ] the Motion to Inform Settlement as per requirement of the FRBP 9011 .… **PRLP has not withdrawn the motion.**

(emphasis in original). PRLP filed both a response to the Debtors' Urgent Motion and an "Urgent Motion to Vacate and Set Aside the Opinion and Order Entered De-

cember 30, 2015 or for Enlargement of Time to Appeal" ("Motion to Vacate").

The Debtors opposed the Motion to Vacate, stating: "PRLP, now that there is an adverse ruling in [the Debtors'] favor, wishes to bind the Debtors to a settlement transaction which was not finalized prior to the entry of the Opinion and Order due to its own failure." (emphasis omitted). They added:

> It was not [until] AFTER the entry of the adverse ruling that PRLP submitted its final approval of certain documents and still omitted the accepting ballot [sic]. Moreover, PRLP has as of this date, not executed the ballot in favor of the Plan. Therefore, PRLP is suffering the consequences of its own actions and delay as the agreement was not finalized, nor submitted for Court approval prior to the entry of the Opinion and Order that favors the Debtors ... [and] ... even if there were a final agreement, which Debtors dispute, Court approval was required prior to its enforceability.

Relying upon the decision in In re Sparks, 190 B.R. 842 (Bankr. N.D. Ill. 1996), the Debtors argued that "any ruling regarding the enforceability of the document entitled *Settlement Agreement* should not interfere with the finality of the Opinion and Order. These are two unrelated legal issues." They complained that PRLP "never submitted the accepting vote prior to the entry of the Opinion and Order, there was not a completed agreement and the Opinion and Order shall prevail." In conclusion, they contended:

> [T]he Opinion and Order is a well-founded ruling which is sustained by the facts, the evidence and the law. Therefore, the Debtors have no doubt that the same, if appealed by PRLP, <u>will be confirmed even at the highest levels and the ruling of this Honorable Court will prevail.</u> Therefore, there is no need, nor cause has been shown, for an extension of time to appeal.

On January 13, 2016, the bankruptcy court denied, without a hearing or explanation, the Motion to Vacate ("Order Denying Motion to Vacate").[10]

## J. Second Amended Plan

On January 29, 2016, the Debtors filed the Second Amended Plan to implement the bankruptcy court's rulings set forth in the December 30, 2015 Decision. The Second Amended Plan provided for the payment of post-petition interest at 5% on PRLP's claim, and eliminated CRIM's unsecured claim. On February 15, 2016, PRLP objected to the Second Amended Plan, reaffirming its previous objections and asserting new objections based on the post-petition interest rate, the preservation of its liens, and feasibility concerns. PRLP also argued that the Second Amended Plan failed to incorporate the terms of the Settlement Agreement. In response, the Debtors argued, among other things, that PRLP's attempts to force them to comply with the Settlement Agreement were contrary to the December 30, 2015 Decision, which was the law of the case. Additional replies and responses followed.

10. On that same date, PRLP appealed the December 30, 2015 Decision in both the Corporate Debtor and the Individual Debtors' cases. See BAP Nos. PR 16–003 and PR 16–004. The Panel dismissed the appeals for lack of jurisdiction as the appealed order was interlocutory. The Debtors filed cross-appeals with respect to the Reinstatement Order, but those appeals were also dismissed as interlocutory. See BAP Nos. PR 16–008 and PR 16–009.

### K. Motion to Enforce Settlement Agreement

In the meantime, on February 5, 2016, PRLP filed a "Motion for Entry of Order Finding that the Settlement Agreement is Binding and Enforceable" ("Motion to Enforce Settlement"), in which it represented in pertinent part:

> [T]he notice requirement of Rule 9019 is discretionary and not mandatory. In any case, it cannot be used to allow Debtors to avoid the duly executed Settlement Agreement. Consequently, this Court should immediately proceed with the approval of the Settlement Agreement under Rule 9019. In the alternative, Debtors should be compelled to request the approval of the Settlement Agreement and implement in their plan of reorganization the terms of the Settlement Agreement.

Thus, PRLP requested "that the Court enter [an] order (i) finding that the Settlement Agreement is binding and enforceable between Debtors and PRLP, (ii) approving the Settlement Agreement, or in the alternative, compelling Debtors to request approval of the Settlement Agreement, [and] (iii) enforcing the terms and provisions contained in the Settlement Agreement. ..." The Debtors opposed the motion, and PRLP filed a response to that opposition in which it argued, among other things, that the Second Amended Plan failed to implement the terms of the Settlement Agreement.

### L. May 10, 2016 Status Conference

Following the issuance of mandates on March 30, 2016 relating to the dismissal of PRLP's interlocutory appeals of the December 30, 2015 Decision, the bankruptcy court scheduled a status conference for May 10, 2016.

The audio file for the May 10, 2016 status conference reveals that the court rejected PRLP's arguments that the Settlement Agreement was binding due to a "meeting of the minds," and that the parties had agreed to all the essential terms of the settlement, including how those terms would be implemented. It viewed the matter as "straight forward," finding that there was "no agreement." The court noted that the attorneys for the parties did not execute the agreement, as well as the absence of a corporate resolution. It also expressed concern that there was no motion for authority to compromise, no notice, and no court approval, stating that the "meat" of the agreement was a sale of the Corporate Debtor's property which required notice and bankruptcy court approval. The court observed that, had the parties informed the court of their settlement negotiations, it would have delayed the issuance of a decision on the pending motions for reconsideration. Notably, the court did not specifically address whether it would have approved the Settlement Agreement if it and the documents contemplated by it had been filed. Despite the parties' discussion of the Motion to Enforce Settlement, and the bankruptcy court's rulings on the matter, the "Minutes of Proceeding" of the status conference ("Status Conference Order") did not mention the Motion to Enforce Settlement or the court's ruling on it.

At the conclusion of the status conference, the court directed the parties to brief only the following remaining issues for plan confirmation: (1) the applicable rate for post-petition interest; (2) whether PRLP's liens were preserved in light of a new lease agreement with CRIM; and (3) the current feasibility of the Second Amended Plan based on the new lease agreement with CRIM and the post-petition interest to be paid PRLP. Thereafter, the parties filed their briefs as directed by the court.

## M. The September 2016 Order and Confirmation Order

On September 23, 2016, the bankruptcy court issued an Opinion and Order ("September 2016 Order") addressing the remaining issues for confirmation relating to post-petition interest for PRLP's aggregate claim, the retention of PRLP's lien on rents from the new lease agreement with CRIM, and feasibility concerns relating to the Debtors' ability to pay PRLP's secured claim, particularly the substantial balloon payment to pay the balance of the claim in full. In re Manuel Mediavilla, Inc., No. 13-2800 (MCF), 2016 WL 5360621 (Bankr. D.P.R. Sept. 23, 2016). On that same day, the court entered a separate order confirming the Second Amended Plan (the "Confirmation Order"). Thereafter, PRLP filed notices of appeal with respect to the September 2016 Order, the Confirmation Order, and several previous orders subsumed therein, namely, the December 30, 2015 Decision, the Order Denying Motion to Vacate, and the Status Conference Order. The Debtors filed cross-appeals with respect to the Reinstatement Order.

## JURISDICTION

We have jurisdiction to hear appeals from final judgments, orders, and decrees of the bankruptcy court. 28 U.S.C. § 158(a)(1), (b)(1). A bankruptcy court's order confirming a chapter 11 plan is a final, appealable order. Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.), 370 B.R. 452, 459 (1st Cir. BAP 2007) (citation omitted). In addition, "[u]nder the 'merger rule,' prior interlocutory orders merge with the final judgment in a case, and ... may be reviewed on appeal from the final order." In re Westinghouse Sec. Litig., 90 F.3d 696, 706 (3d Cir. 1996) (citations omitted); see also Diaz–Santos v. Dep't of Educ. of Commonwealth of P.R., 108 Fed.

Appx. 638, 641 (1st Cir. 2004) (stating that interlocutory orders merge in the final judgment); Brandt v. Wand Partners, 242 F.3d 6, 14 (1st Cir. 2001) ("[W]here the [trial] court has made interlocutory decisions before entering a final judgment, an appeal from the final judgment brings up the interlocutory decisions for review by [the appellate] court."). Thus, upon entry of the Confirmation Order, the bankruptcy court's prior interlocutory orders, including its denial of the Motion to Vacate and its implicit denial of the Motion to Enforce Settlement, became final and subject to review on appeal.

## STANDARD OF REVIEW

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. See Jeffrey P. White & Assocs., P.C. v. Fessenden (In re Wheaton), 547 B.R. 490, 496 (1st Cir. BAP 2016) (citation omitted). Appellate courts review a court's factual determination as to whether the parties assented to settlement and intended to be bound by it for clear error. RE/MAX Int'l, Inc. v. Realty One, Inc., 271 F.3d 633, 645 (6th Cir. 2001); Clawson v. IndyMac Bankcorp, Inc. (In re Clawson), 434 B.R. 556, 565 (N.D. Cal. 2010). Questions regarding the bankruptcy court's interpretation of a settlement agreement are legal issues reviewed de novo. In re Clawson, 434 B.R. at 565 (citations omitted). Courts review a bankruptcy court's ultimate determination as to whether to enforce a settlement agreement for an abuse of discretion. Deville v. United States, 202 Fed.Appx. 761, 762 (5th Cir. 2006); RE/MAX Int'l, Inc., 271 F.3d at 645; Therma–Scan, Inc. v. Thermoscan, Inc., 217 F.3d 414, 419 (6th Cir. 2000). A court abuses its discretion if it "relies upon an improper factor, neglects a factor entitled to substantial weight, or considers the correct mix of factors but makes a clear error of judgment in weighing them." Mer-

cado v. Combined Invs., LLC (In re Mercado), 523 B.R. 755, 761 (1st Cir. BAP 2015) (quoting Bacardí Int'l Ltd. v. V. Suárez & Co., 719 F.3d 1, 9 (1st Cir. 2013)).

## DISCUSSION

Although PRLP and the Debtors raise numerous issues in these appeals relating to confirmation of the Second Amended Plan, the threshold issue relates to the Settlement Agreement. PRLP argues that the bankruptcy court erred when it failed to acknowledge the binding agreement between the parties and it abused its discretion when it failed to enforce the terms of the Settlement Agreement. We agree. For the reasons set forth below, we conclude that the bankruptcy court: (1) clearly erred when it found there was no agreement between the parties; (2) committed legal error when it concluded there was no enforceable agreement because the parties had not sought or obtained court approval under Bankruptcy Rule 9019; (3) abused its discretion in failing to determine, or in implicitly denying, the Motion to Enforce Settlement; and (4) committed legal error when it confirmed the Second Amended Plan predicated upon the absence of an enforceable Settlement Agreement. In summary, the bankruptcy court improperly conflated the issue of whether the Settlement Agreement was binding between the parties with the issue of whether the Settlement Agreement was enforceable under applicable bankruptcy law and procedural rules.

As the Settlement Agreement provided that it is to be interpreted under both the laws of Puerto Rico and the Bankruptcy Code, the Panel must analyze what law applies to both the existence and enforcement of the Settlement Agreement, while affording proper respect for the federal policy encouraging settlement of bankruptcy litigation. The bankruptcy court erred by failing to properly analyze these issues.

## I. Policy Encouraging Settlements

Settlement agreements are favored by courts in the First Circuit and elsewhere. In Fidelity & Guaranty Ins. Co. v. Star Equipment Corp., the United States Court of Appeals for the First Circuit endorsed settlement of litigation, stating: "Settlement agreements enjoy great favor with the courts 'as a preferred alternative to costly, time-consuming litigation.'" 541 F.3d 1, 5 (1st Cir. 2008) (quoting Mathewson Corp. v. Allied Marine Indust., Inc., 827 F.2d 850, 852 (1st Cir. 1987)). Thus, a party to a settlement agreement may seek to enforce the agreement's terms when the other party refuses to comply. Malave v. Carney Hosp., 170 F.3d 217, 220 (1st Cir. 1999). If there are disputed questions of fact regarding the existence of a settlement agreement, "the court should hold a hearing and resolve the contested factual issues." Fid. & Guar. Ins. Co., 541 F.3d at 5. Whether an agreement exists is different from the question of whether the bankruptcy court should enforce the agreement against a party. We address the first question in Part II and the second question in Part III below.

## II. The Existence of a Valid Agreement

The existence of a contract is informed by applicable principles of contract law, which themselves depend upon a preliminary choice of law issue. Here, the Settlement Agreement provides that it is to be interpreted and construed under the laws of Puerto Rico and the Bankruptcy Code. This provision is not entirely helpful to an analysis of the threshold issue of whether a valid agreement existed: the Bankruptcy Code does not provide explicit rules for the interpretation or construction

of agreements. We will, therefore, respect the parties' choice of law selection and apply Puerto Rico law in determining the existence of a valid agreement. See Raleigh v. Ill. Dept. of Rev., 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.") (citation omitted); McCarthy v. Azure, 22 F.3d 351, 356 n.5 (1st Cir. 1994) (stating "a reasonable choice-of-law provision in a contract generally should be respected"); Restatement (Second) of Conflict of Laws § 187(2) (1971) (indicating that when the parties to a contract elect that their contract be governed by the law of a state, their choice will be respected if the state chosen bears a substantial relation to the transaction). Applying Puerto Rico law here is compelling because the parties' litigation deals with real estate in Puerto Rico owned by residents of Puerto Rico, and encumbered by mortgages granted to a bank based in and doing business in Puerto Rico.

The contours of Puerto Rico contract law have been described in the following terms:

> Article 1709 of the Civil Code of Puerto Rico defines a settlement agreement or "contract of compromise" as "a contract by which each of the parties in interest, by giving, promising, or retaining something, avoids the provocation of a suit, or terminates one that has already been instituted." 31 L.P.R.A. § 4821. Contracts of compromise are consensual, bilateral and onerous. See U.S. Fire Ins. Co. v. A.E.E., 170 [174] D.P.R. 846, 853 [2008 WL 4488194] (2008). Through them, the parties settle a certain controversy with the purpose of avoiding the burdens of litigation. See Q.M. Scaevola, *Código Civil*, Volume XXVIII, Instituto Editorial Reus, Madrid, 1953, pág. 246. They are "consensual, mutually binding contract[s], with a subjective consideration, having a determinant or declaratory effectiveness, through which the parties exercise their discretion to, via mutual waivers and releases, and sometimes complementary payments, settle a justiciable legal controversy." Citibank, N.A. v. Dependable Insurance Co., Inc., 21 P.R. Offic. Trans. 496, 504-505 [121 D.P.R. 503] (1988), quoting A. Moxo Ruano, Notas sobre la naturaleza de la transacción, 34 Rev. Der. Priv. 673 (1950).
>
> A "contract of compromise" requires: (1) a controversy or uncertain judicial relationship that represents the probability of litigation or an existing one; (2) the parties' intent to substitute the uncertainty of the controversy with the certainty of an uncontested relationship; and (3) reciprocal concessions of the parties. See U.S. Fire Ins. Co. v. A.E.E., 170 [174] D.P.R. at 853-854 ....
>
> Settlement agreements should be interpreted in accordance with the general rules of contract interpretation, pursuant to which the settlement contract should not be understood to include things that were not intended by the parties to be included and, further, if the terms are clear, they should be literally applied. Id. at 12. Finally, to discern the intent of the parties, the court should consider the parties' actions before, during and after the settlement contract, as well as any other circumstances which indicate their volition. Id. ... Article 1044 of the Civil Code of Puerto Rico provides that "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." 31 L.P.R.A. § 2994. Moreover, Article 1233 of the Civil Code of Puerto Rico provides that "[i]f the terms of a contract

are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." 31 L.P.R.A. § 3471....

In re Frau, No. 09-11136 ESL, 2014 WL 1464842, at *8 (Bankr. D.P.R. Apr. 15, 2014); see also Citibank Global Mkts., Inc. v. Rodríguez Santana, 573 F.3d 17, 24 (1st Cir. 2009) ("Under Puerto Rico law, a contract has three elements: consent, a definitive (and legal) object, and consideration."); In re Farmacias P.R., 556 B.R. 22, 25 (Bankr. D.P.R. 2016) (" 'Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract.' ") (citation omitted); P.R. Laws Ann. tit. 31, §§ 3391, 3401.

■■■ Applying the laws of Puerto Rico to the Settlement Agreement, and reviewing it de novo, we rule that all requirements for "a contract of compromise" are present and the parties' intentions were clearly set forth. There was a controversy and an "uncertain judicial relationship that represent[ed] the probability of litigation" because of the pendency of the parties' motions for reconsideration of the June 16, 2015 Order. See In re Frau, 2014 WL 1464842, at *8. The parties, through their Settlement Agreement, unequivocally substituted the uncertainty stemming from a judicial decision with the certainty of a contract. Finally, there were reciprocal concessions. In the Settlement Agreement, PRLP essentially agreed to accept a "deed in lieu" for one of the Corporate Debtor's commercial properties in Humacao in full satisfaction of a secured claim in the sum of $1,600,000.00, to release the Debtors from the obligations to pay pre-confirmation and post-confirmation interest, and the balloon payment of $1,700.000.00, and that the Debtors would retain their other properties. The Debtors also obtained a commitment from PRLP to vote its unsecured deficiency claims in favor of an amended plan while foregoing distributions on those claims. PRLP intended to avoid the cost and expense of continued litigation and to obtain a piece of the Debtors' commercial real estate.[11]

Although the parties, through their executed Settlement Agreement, contemplated filing additional documents with the

---

11. There are some decisions that encourage federal courts to look to federal common law in determining the existence of an agreement where federal law supplies the cause of action. See, e.g., Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 14 (1st Cir. 2001). "Factors relevant to the determination of whether federal law should be applied include: the need for a uniform federal rule, the extent to which the transaction in question fits within the normal course of activities regularly governed by state law, and the possibility of the state rule frustrating the operation of the federal statutory scheme." Royal Bank & Trust Co. v. Pereira (In re Lady Madonna Indus., Inc.), 76 B.R. 281, 287–88 (S.D.N.Y. 1987) (citing Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 889–90 (3d Cir. 1975), and Bast v. Orange Meat Packing Co. (In re G & L Packing Co.), 41 B.R. 903 (N.D.N.Y. 1984)), When we apply these factors to the matter at hand, it appears more appropriate to apply Puerto Rico law than to apply principles of federal common law. See, e.g., In re Enesco Grp., Inc., No. 07B565, 2015 WL 5152379, at *4 (Bankr. N.D. Ill. Sept. 2, 2015). Regardless of whether federal or Puerto Rico law controls, the evaluation is ultimately the same. "As under general principles of contract law," the issue of whether a contract exists under federal common law is "ordinarily a function of the parties' intent as expressed in the language of the contract documents." McCarthy v. Azure, 22 F.3d at 355 (citing NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir. 1985) (explaining that contract interpretation, under federal law, "dovetails precisely with general principles of contract law," such that, under both, "the judicial task in construing a contract is to give effect to the mutual intentions of the parties")).

bankruptcy court—including a Stipulation, a Transfer Motion, and a Plan Incorporating Settlement—the essential terms that would be included in those documents are set forth in detail in the Settlement Agreement. It is clear from the record that the Debtors' decision to renege on the agreement was due entirely to the bankruptcy court's reversal of its prior rulings on the consolidated treatment of PRLP's claims under a joint plan and the issuance of the December 30, 2015 Decision. Indeed, just four days after PLRP filed its Motion to Inform, the Debtors expressed their view that the Settlement Agreement was not final and disavowed the contract. The timing of the bankruptcy court's decision on the motions for reconsideration was fortuitous. Had that decision not been issued almost contemporaneously with the execution of the Settlement Agreement, the Debtors would have had no reason to evade the obligations that they voluntarily assumed when executing the Settlement Agreement. Their decision to renege on the Settlement Agreement in the immediate aftermath of the court's December 30, 2015 Decision sheds no light on the Debtors' intentions at the time they executed the agreement when faced with uncertainty as to the bankruptcy court's rulings on the numerous disputed issues and pending motions. From the clear and comprehensive terms of the agreement itself, we easily discern the parties' mutual intentions to bind themselves to an agreement for the purposes of resolving their long-running disputes and to avoid the uncertainty of a judicial decision on the pending motions. We conclude that there was a valid agreement among the parties under Puerto Rico law, and as observed above, under federal common law. See supra note 11.

### III. Enforceability and Approval of the Settlement Agreement

 At the May 10, 2016 status conference, the bankruptcy court stated that the Settlement Agreement was not enforceable because it lacked certain signatures and had not been approved by the court. In the Panel's view, this ruling ignored the settling parties' duty to proceed with a request for approval of the Settlement Agreement in accordance with applicable Bankruptcy Rules, and misconstrued the difference between the existence and enforcement of contracts. Federal law, namely, the Bankruptcy Code and the Bankruptcy Rules, apply to the enforcement of the Settlement Agreement, given the Debtors' pending chapter 11 cases. Indeed, the Settlement Agreement itself set forth the mechanisms for its implementation through a sale under § 363 and confirmation of a plan under § 1129. Furthermore, Puerto Rico law also imposed on the Debtors the obligation to proceed in good faith with the Settlement Agreement. "Puerto Ric[o] law imposes the duty of good faith performance on contracting parties." Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 108–09 (1st Cir. 2001) (citing An-Port, Inc. v. MBR Indus., Inc., 772 F.Supp. 1301, 1314 (D.P.R. 1991) ( "The requirement of good faith between the parties in a contract ... must guide all contacts between the contracting parties during the existence of the relationship."); AMECO v. Jaress Corp., 98 P.R.R. 820 (1970) (contracting parties have obligations by law that extend "to cover not only what has been expressly stipulated, but also the consequences which, according to their nature, are in accordance with good faith"); P.R. Laws Ann. tit. 31, § 3375 (1990)).

 The Bankruptcy Rules provide a procedure for the bankruptcy court's consideration of a motion to approve a compromise or settlement at the request of a trustee or other estate representative. See Fed. R. Bankr. P. 9019(a). Specifically,

Bankruptcy Rule 9019(a) provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr. P. 9019(a). Once a motion to compromise is filed:

> A bankruptcy judge has the authority to approve a compromise of a claim pursuant to Bankruptcy Rule 9019(a). The ultimate issue on appeal is whether the bankruptcy court abused its discretion when it approved the compromise, which is a process requiring the bankruptcy court to "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re GHR Cos., 50 B.R. 925, 931 (Bankr. D. Mass. 1985) (quoting In re Boston & Providence R.R., 673 F.2d 11, 12 (1st Cir. 1982)). The specific factors which a bankruptcy court considers when making this determination include: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. In re Anolik, 107 B.R. 426, 429 (D. Mass. 1989).

Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995) (footnote omitted); see also Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 50 (1st Cir. 1998).

Thus, a multi-step process governs the execution and enforcement of a settlement agreement in a bankruptcy case. As in any other civil proceeding, first the parties execute an agreement. Then, if one party to the agreement reneges, the other party may move to enforce it in an appropriate tribunal. In a bankruptcy case, there is an additional step: the agreement must also be presented to the court for consideration after notice and an opportunity for a hearing.

The Debtors' arguments—that the Settlement Agreement was unenforceable because the execution of the Transfer Agreement, Stipulation, and Plan Incorporating Settlement was required and PRLP had not submitted its ballots—are disingenuous. Their initial response to PRLP's Motion to Inform is telling. Although arguing that "the entire negotiations were subject to final essential complimentary documents," they stated that "the transaction had to be stayed and reviewed under the new circumstances of the [December 30, 2015 Decision]." In this response, the Debtors essentially admitted to breaching their obligation to submit the Settlement Agreement to the bankruptcy court and request its approval. As noted above, that argument is unpersuasive in view of the detailed provisions and procedures to effectuate and enforce it set forth in the Settlement Agreement.

 The bankruptcy court determined "there was no agreement," referencing the absence of a corporate resolution and attorney signatures on the Settlement Agreement. We conclude that neither the absence of a corporate resolution nor the absence of attorney signatures supports the bankruptcy court's determination. The Settlement Agreement itself at paragraphs 12 and 15 set forth sufficient authorization, particularly where the Corporate Debtor was solely owned by Mr. Mediavilla. Moreover, as the United States Court of Appeals for the First Circuit has recognized, "the decision to settle litigation belongs to

the client, not the lawyer. The rule logically implies that a settlement agreement entered into by an attorney is ineffective if the attorney did not possess actual authority to bind the client, and the cases so hold." Malave, 170 F.3d at 221 (citations omitted). Thus, the Settlement Agreement was not rendered unenforceable simply because counsel did not execute it.

■ The bankruptcy court also concluded that the Settlement Agreement was unenforceable because of the absence of compliance with Bankruptcy Rules 9019 and 6004 and, in particular, the absence of notice. "Courts are divided on the issue of whether an agreement is binding on the parties pending approval by the Bankruptcy Court." In re Filene's Basement, LLC, No. 11-13511 (KJC), 2014 WL 1713416, at *6 (Bankr. D. Del. Apr. 29, 2014) (quoting Pineo v. Turner (In re Turner), 274 B.R. 675, 679 (Bankr. W.D. Pa. 2002) (collecting cases and recognizing that some courts reason that the absence of court approval does not mean that the parties did not reach an agreement, while other courts have determined that an agreement cannot be binding until court approval)); see also Rinehart v. Stroud Ford, Inc. (In re Stroud Ford, Inc.), 205 B.R. 722, 724 (Bankr. M.D. Pa. 1996) (same). We conclude that the better-reasoned view is that the absence of court approval is only a bar to enforceability; it does not equate to the lack of the "existence" of the agreement

between the parties as the bankruptcy court erroneously determined. See In re United Shipping Co., No. 4-88-533, 1989 WL 12723, at *5 (Bankr. D. Minn. Feb. 17, 1989) ("The absence of court approval does not mean that the parties did not agree to the settlement. It only means that the court has not yet approved it. The considerations a court looks at in approving a settlement are entirely different than whether or not there was an agreement at all.").[12] The bankruptcy court's ruling to the contrary confounded the two inquiries in the analysis and elevated form over substance, essentially permitting the Debtors to evade their contractual obligations under the Settlement Agreement.

In sum, the bankruptcy court's decision to implicitly deny PRLP's Motion to Enforce Settlement was an abuse of discretion because it was premised upon the erroneous legal conclusions that the Settlement Agreement was not binding between the parties, and thus "non-existent," and that the parties were not obligated to file the Transfer Motion, Stipulation, and Plan Incorporating Settlement with the bankruptcy court pursuant to the Settlement Agreement. The court failed to distinguish between the enforceability of the Settlement Agreement, which was a binding contract among the parties, and the need for court approval of the Settlement Agreement following adequate notice and an opportunity for a hearing which would be

---

**12.** Contra In re Sparks, 190 B.R. at 845 ("The settlement agreement here involved disposition of estate assets and its terms were to be incorporated into a plan of reorganization. Sections 363 and 1129 are the substantive provisions of the Bankruptcy Code requiring a hearing and court approval; Rule 9019 merely sets forth the procedure for approving an agreement to settle or compromise a controversy. The creditors of this estate had to be notified of the agreement and this Court had to approve it before it became enforceable."). We conclude that the decision in Sparks is

unpersuasive for three reasons. First, Sparks is factually distinguishable because the debtors in that case incorporated the terms of an agreement into a plan that they filed with the bankruptcy court before they sought to repudiate the agreement. See id. at 843. Second, the bankruptcy court in that case failed to distinguish between the debtors and the bankruptcy estate in its enforceability analysis. See id. at 844. And third, the law applicable to the agreement in this case imposes a duty of good faith and fair dealing. See Adria Int'l Grp., Inc., 241 F.3d at 108–09.

binding upon the bankruptcy estate upon court approval. In other words, enforcement of the Settlement Agreement between the parties with the requirement to seek court approval is distinguishable from the actual approval of the Settlement Agreement and its concomitant undertakings in conjunction with an amended plan after notice and opportunity for objections and a hearing. See In re Turner, 274 B.R. at 675.

The Debtors did not have a unilateral right to repudiate their Settlement Agreement prior to a court determination of whether to approve the settlement, particularly where the Debtors' repudiation was triggered solely by the bankruptcy court's December 30, 2015 Decision. In these cases, the Debtors had a contractual and good faith obligation to submit the parties' compromise to the court for consideration and failed, without reasonable justification, to do so. To permit the Debtors to breach their agreement with PRLP without consequence would defeat the principle that settlements are favored "as a preferred alternative to costly, time-consuming litigation." See Fid. & Guar. Ins. Co., 541 F.3d at 5.

Moreover, permitting the Debtors to renege in the circumstances present in these cases would sanction a breach of the covenant of good faith performance of the contract. As noted by the court in Musselman v. Stanonik (In re Seminole Walls & Ceilings Corp.), if a party could unilaterally withdraw from a settlement agreement, he or she could strategically enter a settlement agreement and effectively "stay" the proceedings against him and repudiate on the eve of court approval without consequence. 388 B.R. 386, 395 (M.D. Fla. 2008). Condoning such strategy wastes the time and resources of the bankruptcy court and the time and resources of the parties who may have spent hours and substantial sums of money in negotiations, contract

drafting, and contract execution. It also places the estate in a precarious position when negotiating settlements. Contracting parties are entitled to a reasonable measure of assurance that their settlement agreements are valid and effective even though their performance obligations have yet to arise (as a result of the need to obtain court approval). The requirement of bankruptcy court approval of a compromise does not create a right of unilateral repudiation pending the court's consideration of the proposed compromise. See id. To hold otherwise would be contrary to the principles of contract formation and contrary to the strong public policy favoring the settlement of disputes and the orderly administration of bankruptcy cases.

The bankruptcy court's ruling ignored significant obligations of the Debtors and improperly emphasized the requirements of additional notice and court approval of the Settlement Agreement. It also placed too much weight on the presentation of ancillary documents to effectuate the terms of the Settlement Agreement, when the principal terms were already set forth in the Settlement Agreement. The Debtors were obligated to file a Stipulation with the bankruptcy court, together with a request for its approval, as well as the Plan Incorporating Settlement and the Transfer Motion, an implicit if not an express recognition that: (1) the purpose of the Debtors' cases was the restructuring of the PRLP loan; and (2) PRLP was the primary creditor in the chapter 11 cases in which other creditors did not actively participate. The fortuity of the December 30, 2015 Decision did not absolve the Debtors of their obligations under the Settlement Agreement.

■■■ Lastly, the bankruptcy court's reliance on the absence of notice is overstated. The parties agreed to a shortened notice period of seven days for approval of the Stipulation, the Transfer Motion, and

the Plan Incorporating Settlement. At oral argument, counsel for the Debtors acknowledged that, with respect to all creditors other than PRLP, the treatment of creditors under the Plan Incorporating Settlement, as contemplated by the Settlement Agreement, would treat creditors identically. Accordingly, in view of the limited number of claimants, the absence of creditor involvement in the Debtors' cases other than by PRLP and CRIM, and the likelihood that the treatment of any other classes of claims would not change under an amended plan, the bankruptcy court's focus on notice to deny enforcement of the Settlement Agreement was an abuse of discretion.

Finally, we reject the Debtors' argument that their fiduciary obligation as chapter 11 debtors-in-possession required a re-examination of their position vis à vis the Settlement Agreement following the issuance of the December 30, 2015 Decision. As fiduciaries, the Debtors should have complied with the Settlement Agreement, at least until a time when, after notice and opportunity for hearing, the court declined to approve the agreement. That did not happen here.

### CONCLUSION

For the reasons set forth above, we conclude that the bankruptcy court clearly erred when it found there was no agreement between the parties, it committed legal error when it ruled there was no enforceable Settlement Agreement because the parties did not seek or obtain court approval under Bankruptcy Rule 9019, it abused its discretion in failing to determine, or in implicitly denying, the Motion to Enforce Settlement, and it committed legal error in confirming the Second Amended Plan. As a result, we **VACATE** the Confirmation Order and **REMAND** to the bankruptcy court for further proceedings consistent with this opinion. Those further proceedings shall include: (1) the scheduling of prompt deadlines for the Debtors to file a motion to approve the Settlement Agreement together with the Transfer Motion, and the Stipulation, as those terms are defined in this opinion; (2) the scheduling of a hearing on the motion to approve the Settlement Agreement, with notice in accordance with Bankruptcy Rules 2002 and 9019, and consideration of the approval of the Settlement Agreement under generally applicable legal standards; (3) the scheduling of prompt deadlines for the Debtors to file a further amended plan; and (4) in the event the Debtors do not promptly file a motion to approve the Settlement Agreement, the scheduling of a hearing on PRLP's Motion to Enforce Settlement.